| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| DATA COOLING TECHNOLOGIES LLC, | ) |
| *et al.*,[1] | ) Case Nos. 17-52170 and 17-52177 |
| | ) (Request for Joint Administration |
| Debtors. | ) Pending) |
| | ) |
| | ) Judge Koschik |

**DECLARATION OF GREGORY GYLLSTROM IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Gregory Gyllstrom, under penalty of perjury pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am the Chief Executive Officer of Data Cooling Technologies LLC ("DCT"), which is affiliated with Data Cooling Technologies Canada, LLC ("DCT Canada") (together, the "Debtors"). In this capacity, I am familiar with the DCT's businesses, day-to-day operations, and financial affairs.

2. On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Northern District of Ohio (the "Court"), and filed various motions described herein requesting certain relief (collectively, the "First Day Pleadings"). I submit this declaration (the "Declaration") in support of the Debtors' chapter 11 cases and the First Day Pleadings.

3. Except as otherwise indicated, all statements set forth in this Declaration are based upon: (i) my personal knowledge as Chief Executive Officer of DCT; (ii) information

---

[1] The Debtors and the last four digits of each of the Debtors' tax identification numbers following in parentheses are: Data Cooling Technologies LLC (3425); and Data Cooling Technologies Canada LLC (3172).

{6904706:4}

supplied to me by other members of the Debtors' management or the Debtors' professionals; (iii) my review of DCT's relevant documents; and/or (iv) my experience and knowledge of the DCT's business operations and financial affairs. I have acted as Chief Executive Officer of DCT since June 2, 2017. I was most recently Chief Executive Officer of Transtar Industries in Cleveland, Oho, and I have served in senior management in both automotive and industrial businesses for many years.

4.     The First Day Pleadings are intended to enable the Debtors to operate efficiently and effectively during the chapter 11 cases, as well as to avoid certain adverse consequences that might otherwise result from the commencement of the chapter 11 cases. Among other things, the First Day Pleadings seek relief aimed at sustaining the going concern value of the Debtors. I also believe that, absent immediate access to the use of cash collateral and authority to make certain essential payments as sought under and described in greater detail in the First Day Pleadings, the Debtors would suffer immediate and irreparable harm to the detriment of their bankruptcy estates.[2]

5.     If called to testify, I could and would testify to the facts set forth in this Declaration. I am authorized by the Debtors to submit this Declaration. I have reviewed the First Day Pleadings, and it is my belief that the relief sought therein is necessary to (i) avoid immediate and irreparable harm to the Debtors' business, and (ii) maximize and preserve the value of the Debtors' bankruptcy estates. Unless otherwise indicated, the financial information contained herein is unaudited and subject to change.

---

[2] The relief requested in the First Day Pleadings is primarily relevant to DCT. DCT Canada is party to a few contracts but has few if any assets. In an abundance of caution, however, the relief is requested for both Debtors.

## Background

6.      The Debtors filed these chapter 11 cases as a means of maintaining the going concern value of their businesses and assets and conducting a process to maximize value for stakeholders.  This section of this Declaration provides an overview of the Debtors' businesses, a description of the Debtors' capital structure, an explanation of the reasons for the filing of the chapter 11 cases, and a roadmap for how the Debtors plan to achieve their goals through this process.

### A.      Overview of the Debtors' Business

7.      Until recently, the Debtors were part of larger corporate enterprise with separate divisions that included (i) Air Enterprises Custom Air Handling, which provides all-aluminum air handling solutions worldwide; (ii) Thermotech, which supplies energy recovery wheels, heatwheels and related systems; and (iii) KyotoCooling™, which provides cooling systems for data centers within North America.  The Debtors divested the Air Enterprises Custom Air Handling legacy business in May 2017, leaving the remaining businesses consolidated.

8.      The Debtors are the exclusive provider in North America of the KyotoCooling™ system.  Using the KyotoCooling™ system, the Debtors provide water-free, environmentally friendly cooling for data centers, a rapidly growing market.  KyotoCooling™ delivers the best possible power usage effectiveness (PUE), which is the efficiency of a cooling plant with respect to the critical load being cooled.  With exclusive rights to a product that competes in a dynamic market in an energy efficient and environmentally friendly manner, the Debtors have a promising business.  The Debtors have grown quickly, going from no revenue from the KyotoCooling™ business a few years ago to $58 million in revenue in the first six months of 2017.

**B.   Capital Structure**

9.   The capital structure of the Debtors is simple.   DCT and KeyBank, N.A. (the "Prepetition Secured Lender") are parties to that certain Second Amended and Restated Credit Agreement, dated April 27, 2016 (as amended, the "Credit Agreement"), which consists of a line of credit facility and a term loan. The obligations of DCT to KeyBank under the Credit Agreement are secured by first priority liens and security interests in substantially all of the assets of DCT, including all accounts receivable, equipment and inventory of DCT. As of the Petition Date, the balance on the line of credit was fully paid off and the balance remaining on the term loan was approximately $1.933 million.   Because of defaults under the Credit Agreement, DCT does not currently have the ability to borrow under the line of credit.

10.   As of the Petition Date, the Debtors also had unsecured obligations in excess of $10 million, including more than $7 million in trade debt, $1.5 million in unsecured note debt, disputed royalty payments of approximately $1.7 million, and other unliquidated claims.

**C.   Events Leading to Bankruptcy**

11.   The Debtors have faced a number of significant challenges over the past months, ultimately leading to the filing of these chapter 11 cases.  The Debtors grew very quickly under former management, which led to top line revenue but also led, in some cases, to installations that were delayed or did not go smoothly.  While 2016 sales and early 2017 revenue were strong, the Debtors have struggled since March of 2017 to generate new orders, leading to a shrinking backlog and ultimately to liquidity concerns.  There are a number of possible reasons for the dearth of new orders.  First, there was an industry-wide slowdown in the first half of 2017, as some temporary overcapacity was absorbed.  Second, as mentioned above, the Debtors did have issues with certain installations.  Although in some cases the combination of the Debtors' product with other parts of cooling systems supplied by other contractors and sub-contractors

was part of the problem, the fact is that the Debtors did not always delivery exactly what was promised when it was promised. The eco-system for a data center cooling system is complex and unique. Accordingly, problems happen.

12. However, the Debtors are also convinced that a significant reason for their inability to generate new orders is KyotoCooling North America, LLC ("KCNA"). KCNA is the holder of the patent for the KyotoCooling™ system. DCT acquired the exclusive North American rights to produce and sell the KyotoCooling™ system from KCNA under a license agreement (the "License Agreement"), paying $1.55 million in cash plus a stream of quarterly royalty payments that to date has totaled more than $4.8 million.

13. The Debtors have now become aware that KCNA is attempting to re-acquire the North American rights as a way to integrate DCT's business with the business of KCNA's parent company KyotoCooling™, B.V., creating an extremely valuable global business. To do so, KCNA has taken illegitimate steps. These activities include inappropriate contact with the Debtors' suppliers, customers, and potential customers, leading to difficulties in the Debtors' businesses. Among other things, KCNA has repeatedly told the Debtors' business partners that the Debtors will fail and KCNA will be there to partner with them in the future. Moreover, in addition to the interference in violation of exclusivity provisions of the License Agreement, KCNA has violated the License Agreement in numerous other ways, including by: (1) unreasonably withholding approval of suppliers and vendors; (2) failing to provide consent to allow the Debtors to sell product out of the North American territory to customers that come from that territory, as required; and (3) refusing to provide certain know how and support required by the License Agreement.

14.     Essentially, the Debtors believe that KCNA is trying to destroy the Debtors' business so that it can pick up the pieces and inappropriately profit from rights it already sold to the Debtors.  Most recently, on September 1, 2017, in clear violation of the License Agreement and the Debtors' rights, KCNA issued a press release that it was terminating the License Agreement and taking over North American production of the KyotoCooling™ system.  While KCNA may take a litigation position that DCT has breached the License Agreement (a position disputed by DCT), the press release is an intentional attack on the Debtors' businesses and assets designed to destroy the business once and for all.

### Plan for the Chapter 11 Cases

15.     The Debtors have filed these cases to preserve their assets, most importantly the License Agreement, for the benefit of their stakeholders.  They intend to emerge from chapter 11 through a plan of reorganization as a stronger company.  In the process, it is obvious from the actions of KCNA that the Debtors' rights against KCNA, both with regard to the License Agreement itself and the damages KCNA has caused to the Debtors' businesses, may need to be litigated.   The Debtors are hopeful, however, that KCNA will begin to work with DCT to support a plan process or other consensual process to maximize value.

16.     The Debtors believe that a plan of reorganization is in the best interest of the companies, their creditors, their vendors, and the many other parties in interest.

### Facts in Support of the First Day Pleadings

17.     Concurrently with the filing of the chapter 11 cases, the Debtors have filed a number of First Day Pleadings,[3] each of which is described briefly below.  I have reviewed each of the First Day Pleadings (including the exhibits thereto), and I believe that the relief sought in

---

[3] Capitalized terms used in the descriptions of the First Day Pleadings and not otherwise defined herein have the meanings given to them in the applicable First Day Pleadings.  The descriptions of the First Day Pleadings contained herein are only intended to be summaries.

each of the First Day Pleadings: (i) is necessary to enable the Debtors to operate in chapter 11 with a minimum of disruption; and (ii) constitutes a critical element in maintaining the value of the Debtors' assets during the chapter 11 process. The Debtors anticipate that the Court will conduct a hearing soon after the commencement of the chapter 11 cases (the "First Day Hearing") at which the Court will hear and consider the First Day Pleadings.

18.    Generally, the First Day Pleadings have been designed to meet the primary goal of continuing the Debtors' operations postpetition in a manner that will minimize any potential impact on the Debtors' business. As such, the First Day Pleadings seek to: (i) obtain the continued use of the Debtors' cash; (ii) protect the Debtors' employees and other parties in interest; (iii) maintain the Debtors' operations and business throughout the chapter 11 cases; and (iv) efficiently administer the bankruptcy cases.

**A.    Motion of Debtors for an Order (i) Directing Joint Administration of Cases; and (ii) Approving Caption for Jointly Administered Cases (the "Joint Administration Motion")**

19.    DCT and DCT Canada are related entities, with DCT Canada being a wholly-owned subsidiary of DCT. The Debtors are each Delaware limited liability companies. The Debtors are requesting that the Court jointly administer the Debtors' chapter 11 cases for procedural purposes only and are not requesting that the cases be substantively consolidated at this time. Therefore, the rights of parties in interest will not be prejudiced or otherwise affected in any way by the entry of an order directing the joint administration of the Debtors' chapter 11 cases. The expense and potential confusion of running separate chapter 11 cases would materially hamper the Debtors' restructuring efforts and drive up administrative costs.

20.    I understand that the Bankruptcy Code and Bankruptcy Rules permit the joint administration of chapter 11 cases for procedural purposes only where the Debtors are corporate entities and are affiliated through common ownership. The Debtors are seeking joint

administration of their cases because such joint administration will have a number of beneficial effects. Joint administration will permit the Clerk of this Court to utilize a single general docket for these cases, which will assist both the Court and all parties in interest to more easily track substantive matters related to the cases. The Debtors anticipate that numerous notices in these cases will affect each of the Debtors and their estates. Joint administration will allow the Debtors and the Court, as appropriate, to combine these notices, thus significantly reducing the volume of paperwork and make administrative tasks of the Court and parties and interest less burdensome, costly, and time-consuming.

21.     The Joint Administration Motion also requests a specific official caption to be used by all parties in all pleadings in the jointly administered cases. The Debtors believe that use of this simplified caption, naming "Data Cooling Technologies LLC" as the first of the Debtors, and omitting reference to each Debtor's respective information, will eliminate cumbersome and confusing procedures, and ensure a uniformity of pleading identification. Such information is included in the petitions for each respective Debtor, and such petitions are publicly available to parties in interest or will be provided by the Debtors upon request.

**B.    Motion of Debtors for Interim and Final Orders: Approving (i) Debtors to Obtain Use of Cash Collateral; and (ii) Granting Adequate Protection (the "Cash Collateral Motion")**

22.     The Debtors are seeking authorizing from the Court to allow the use of the cash collateral of KeyBank to fund certain of the expenses set forth in a cash collateral budget (a copy of which is attached to the Cash Collateral Motion) and is requesting that the Court grant adequate protection to KeyBank with respect to the Debtors' use of cash collateral and other diminution in value of the KeyBank's prepetition collateral.

23.     I submit that the Debtors' use of cash collateral is necessary for the Debtors to maintain sufficient liquidity so that they may continue to operate their business during the

pendency of the chapter 11 cases. Without immediate access to the cash collateral, the Debtors will not be able to pay the ongoing costs of running the Debtors' businesses and administering their estates, the result of which will be irreparable damage to the value of the Debtors and reorganization efforts and the corresponding diminution in the value of KeyBank's collateral. Indeed, I understand that if the Debtors are not allowed the use of the cash collateral, the Debtors could not maintain their businesses, and the chapter 11 cases likely would be converted to cases under chapter 7 of the Bankruptcy Code in relatively short order.

24.     Permitting the Debtors to utilize the cash collateral of KeyBank will have the dual effect of protecting the value of KeyBank's collateral, as well as providing the Debtors with the funds necessary to fund the administration of the chapter 11 cases. It is my understanding that, in order to do so, the Debtors must provide some form of adequate protection for the use of KeyBank's cash collateral. It is my understanding that that the law fully contemplates a flexible position in evaluating the Debtors' ability to provide adequate protection. In this instance, the Debtors propose to protect KeyBank's collateral by (i) the granting replacement liens in the new collateral generated by the Debtors' postpetition operations, including liens on the value of proceeds generated from any avoidance action recoveries (subject to an agreed-upon carve-out from such collateral); (ii) the allowance of a superpriority administrative claim; (iii) the making of periodic payments to KeyBank during the cases; and (iv) the provision of regular financial reporting. Additionally, the Debtors anticipate that it will continue to receive cash from collection of receivables sufficient to maintain the going concern value of their business and, therefore, sufficient to protect the value of the KeyBank prepetition collateral.

25.     I have been advised that, without immediate access to the cash collateral, the Debtors expect to suffer an acute cash shortage in the coming days that threatens their ability to

maintain operations in the short term. Accordingly, the Debtors are requesting the immediate ability to use cash collateral in order to avoid immediate and irreparable harm to the Debtors' estates and creditors.

**C.    Motion of Debtors for an Order Granting Additional Time to File Schedules and Statements (the "Extension Motion")**

26.    I understand that the Bankruptcy Code and Bankruptcy Rules require the Debtors to file with the Court within 14 days of the Petition Date: (i) their schedules of assets and liabilities; (ii) their statements of financial affairs; (iii) their schedules of current income and expenditures; (iv) their lists of executory contracts and unexpired leases; and (v) their lists of equity security holders (collectively, the "Schedules and Statements").

27.    By the Extension Motion, the Debtors are seeking entry of an order extending the time for filing the Schedules and Statements for an additional 30 days (for a total of 44 days from the Petition Date), through and including October 22, 2017.

28.    The Debtors are filing the Extension Motion because it has numerous creditors and other interested parties, and the Debtors require additional time to accurately review and report all of the required information. Given the current state of their businesses and the large number of parties in interest, the Debtors have not had ample opportunity to gather all of the necessary information to prepare and file their Schedules and Statements.

29.    The Debtors have commenced the task of gathering the necessary information to prepare and finalize the Schedules and Statements, but Debtors believe that the 14-day automatic extension of time to file such Schedules and Statements provided by Bankruptcy Rule 1007(c) is not sufficient to permit completion of the Schedules and Statements.

**D.** **Motion of Debtors for an Order (i) Authorizing the Debtors to (a) Pay Certain Prepetition Employee Obligations and Related Claims and (b) Continue to Provide Employee Benefits in the Ordinary Course of Business and (ii) Granting Related Relief (the "Employee Motion")**

30.     The Debtors believe that they have valuable assets in their employees, and that any delay in paying prepetition compensation or benefits to their employees would significantly jeopardize the Debtors' relationships with employees and irreparably harm morale at a time when the need for the continued service of the Debtors' employees is most critical.  As of the Petition Date, the Debtors employ approximately 39 employees.  The employees include the Debtors' operators, managers, salespeople, repairmen, and administrative and corporate management employees. The employees are the backbone of the Debtors' company and the Debtors' restructuring efforts, and the Debtors require the full and uninterrupted service of the employees throughout their chapter 11 cases to adequately provide services to the Debtors' customers.  The employees have an intimate knowledge of the Debtors' business and operations, and any deterioration in morale, welfare and focus at this critical time undoubtedly would adversely affect the Debtors, the value of their assets and business, and ultimately, the Debtors' ability to achieve a successful outcome in the chapter 11 cases.

31.     The Debtors have costs and obligations associated with their employees that arose prior to the Petition Date.  Certain of those obligations are outstanding and due and payable as of the Petition Date, and certain will become due and payable in the ordinary course of business after the Petition Date.  These obligations include, but are not limited to, wages, reimbursable expenses, benefit obligations and claims, and workers' compensation obligations.  The Debtors seek the Court's approval to continue each of these programs in the ordinary course of business so as to maintain employee morale and dedication throughout the Debtors' chapter 11 cases.

32.     The Employee Motion does not seek to alter the Debtors' employees' compensation, paid time off, or other benefit policies at this time.  The Employee Motion is intended only (i) to permit the Debtors, in their sole discretion, to make payments consistent with the Debtors' existing polices to the extent that, without the benefit of an order approving the Motion, such payments may be inconsistent with the relevant provisions of the Bankruptcy Code, and (ii) to permit the Debtors, in their discretion, to continue to honor their practices, programs and policies with respect to their employees, as such practices, programs and policies were in effect as of the Petition Date.  Continued payment of all of the obligations detailed in the Employee Motion in accordance with the Debtors' prepetition business practices is in the best interest of the Debtors' estates, their creditors, and all parties in interest, and will enable the Debtors to continue to operate their business in an economic and efficient manner without disruption.

**E.      Motion of Debtors for an Order (i) Authorizing Continued Use of Existing Cash Management Systems; (ii) Authorizing Maintenance of Existing Bank Accounts; (iii) Authorizing Continued Use of Existing Business Forms; and (iv) Waiving Certain Investment and Deposit Requirements (the "Cash Management Motion")**

33.     By the Cash Management Motion, the Debtors are seeking entry of an order (i) authorizing the continued use of their existing cash management system (the "Cash Management System"), (ii) authorizing the maintenance of existing bank accounts (the "Bank Accounts"), (iii) authorizing the continued use of existing business forms and checks (the "Business Forms"), and (iv) waiving certain investment and deposit requirements.

34.     I have been informed that the Operating Instructions and Reporting Requirements for Chapter 11 Cases promulgated by the Office of the United States Trustee for the Northern District of Ohio require that a debtor, among other things:  (i) close all bank accounts and open new debtor in possession bank accounts; (ii) establish a separate debtor in possession account for

all estate monies required for the payment of taxes, including payroll taxes; (iii) maintain separate debtor in possession accounts for cash collateral; and (iv) obtain checks for all debtor in possession accounts which bear the designation "Debtor-In-Possession," the bankruptcy case number, and the type of account. The relief requested in the Cash Management Motion is designed to maintain the status quo and avoid any significant disruptions to their operations.

35.     The Cash Management Motion describes the Debtors' cash management system in detail. The Debtors' cash management system includes six separate bank accounts maintained at KeyBank (collectively, the "Bank Accounts"). Many of the Bank Accounts are primarily utilized by the Debtors to manage payments from customers, and to make disbursements, including vendor payments, payroll, and employee benefits.

36.     The Debtors' cash management system is similar to those commonly employed by companies of comparable size and complexity and allows the Debtors to control and monitor corporate funds, ensure cash availability, and reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balances and presentment information.

37.     Given the Debtors' corporate and financial structure, it would be burdensome for the Debtors to establish an entirely new cash management system. Any disruption of the Debtors' accounting and cash management procedures would be cumbersome and costly to the Debtors' operations, and any delay could have an adverse impact on the Debtors' restructuring efforts, make payments to their employees, and pay other necessary expenses during the chapter 11 process. Thus, under the circumstances, maintaining the Debtors' cash management system is in the best interest of the Debtors' estates, customers, and creditors.

38. The Cash Management Motion also requests this Court's authority for the Debtors to continue using their existing Bank Accounts on a postpetition basis. Allowing the Debtors to continue to use their prepetition Bank Accounts will assist the Debtors in making a smooth transition to operating in chapter 11 and ensure that the Debtors' cash flow is not interrupted.

39. The Cash Management Motion also requests authority for the Debtors to continue using their existing business forms postpetition. The Debtors uses their business forms in the ordinary course of their businesses. By virtue of the nature and scope of the Debtors' businesses and the number of customers and suppliers with whom the Debtors transact business, it is important for the Debtors to continue using their business forms without alteration or change.

40. To prevent unnecessary delay, confusion, and accrual of further expense to the estates, the Debtors request that the Court waive any requirement of adding a "Debtor-in-Possession" legend or number to the business forms other than checks. The Debtors, however, will begin using a "Debtor-in-Possession" stamp or legend for all checks as soon as possible.

41. Finally, the Cash Management Motion requests that this Court waive any applicable investment and deposit guidelines solely with regard to the Bank Accounts during the Debtors' bankruptcy cases. The Debtors' Bank Accounts are not kept at a high-risk institution or in volatile investments. Rather, the Debtors hold standard accounts at a highly regarded, substantial, FDIC-insured and bonded financial institution; therefore, any applicable deposit restrictions can be waived.

F. **Motion of Debtors for an Order (i) Authorizing the Debtors to Pay Prepetition Trust Fund Taxes and (ii) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Relief (the "Taxes Motion")**

42. The Debtors pay taxes to various authorities in the ordinary course of their businesses, including employee-related taxes, sales taxes, and Canadian goods and sales taxes.

As of the Petition Date, the Debtors have collected certain taxes that accrued during a prepetition period, but are not yet due to the relevant taxing authorities. The Debtors have also collected certain "trust fund" taxes for the benefit of the taxing authorities, which do not properly constitute property of the Debtors' estates. The Debtors seek authority to pay all such trust fund taxes in the ordinary course of business.

43.     The Debtors wish to remain current on and continue to pay the trust fund taxes in a timely manner in order to prevent potential issues during the chapter 11 cases and avoid liability for non-payment. The Debtors' failure to pay these taxes would have a detrimental impact on their ability to operate their businesses in the ordinary course. Furthermore, if the Debtors failed to pay these taxes, certain taxing authorities may become involved in the Debtors' bankruptcy cases, possibly creating undue delay and complications to the Debtors' restructuring efforts.

44.     The Debtors' trust fund taxes do not constitute property of the Debtors' estates, and such amounts are not available to the Debtors' creditors. Therefore, immediate payment of the relevant taxes will not adversely affect the Debtors' estates or their creditors. Uninterrupted operations are necessary for the Debtors to maintain their reputations, avoid significant variations in their cash flow, and preserve the value of the businesses for a sale process. The Debtors believe that the estates will not be materially harmed if the Court permits the Debtors to pay the relevant trust fund taxes.

G.      **Motion of Debtors for Interim and Final Orders (i) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services; (ii) Determining That Utilities are Adequately Assured of Payment; and (iii) Establishing Procedures for Determining Requests for Additional Assurance (the "Utilities Motion")**

45.     In connection with the operation of their businesses, the Debtors obtains various utility services, such as gas, electric, water, telephone, cable/internet, waste, and other services

(collectively, the "Utility Services") from certain utility companies (collectively, the "Utility Companies") for the Debtors' company locations and offices in Streetsboro, Ohio and Tampa, Florida. Uninterrupted Utility Services are critical to the Debtors' ability to sustain their operations during the pendency of the chapter 11 cases. Any interruption in the Utility Services, however slight, would jeopardize the restructuring efforts of the Debtors, the Debtors' ability to operate their facilities, and the safety of the Debtors' employees.

46.     By the Utilities Motion, the Debtors seek interim and final orders (the "Interim Utility Order" and "Final Utility Order," respectively):  (i) prohibiting the Utility Companies from altering, refusing, or discontinuing Utility Services (as defined below) to, or discriminating against, the Debtors on account of amounts outstanding prior to the Petition Date or any perceived inadequacy of the Debtors' proposed adequate assurance; (ii) determining that the Utility Companies, including, but not limited to, those listed in the Utilities Motion, have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code through the provision of a two week deposit per requests from utility companies; and (iii) approving the Debtors' proposed procedures for determining requests for additional adequate assurance of payment to Utility Companies for future utility services.

**H.     Motion of Debtors for an Order Scheduling Expedited Hearing to Consider Certain First Day Pleadings and Approving Notice Thereof (the "Expedited Hearing Motion")**

47.     The First Day Pleadings described above involve matters that require an emergency and expedited hearing and the Debtors are requesting that the Court, on an *ex parte* basis, schedule the First Day Hearing as soon as the Court's schedule will permit and that the Court approve the form of notice thereof.

48.     The relief requested in the Expedited Hearing Motion is necessary to obtain expedited relief on the First Day Pleadings.  As described in detail in each of the First Day

Motions, the expedited relief requested in the First Day Pleadings is essential to: (a) obtain financing; (b) ensure a smooth transition into chapter 11; (c) maintain the Debtors' operations and business throughout the chapter 11 cases; (d) efficiently administer the bankruptcy cases; and (e) establish the basis for the Debtors' restructuring efforts. The Expedited Hearing Motion and the First Day Pleadings are of the type typically heard on an emergency or expedited basis, and any delay in authorizing the relief therein could have a severe and irreparable effect on the Debtors' operations and their transition into operating as chapter 11 debtors in possession.

49.     Pending entry of an order approving the Expedited Hearing Motion, the Debtors proposes to serve the "Notice of Expedited Hearing on First Day Motions," which is attached as Exhibit A to the Expedited Hearing Motion, as soon as possible to the various notice parties identified in the Expedited Hearing Motion, including each party whose rights are affected by the First Day Pleadings.

## Conclusion

50.     For all of the reasons stated herein, I believe that the approval of the First Day Pleadings is in the best interest of the Debtors, their estates, their creditors, and all parties in interest.

*[Remainder of page intentionally left blank; signature page to follow]*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

September 8, 2017

Gregory Gyllstrom
Chief Executive Officer of Data Cooling
Technologies LLC