This document was signed electronically on November 30, 2017, which may be different from its entry on the record.

IT IS SO ORDERED.

Dated: November 30, 2017



~~Alan M. Koschik~~

**ALAN M. KOSCHIK**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| DATA COOLING TECHNOLOGIES LLC, | ) |
| *et al.*,[1] | ) Case Nos. 17-52170 and 17-52177 |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) Judge Koschik |
| | ) |

**ORDER (A) AUTHORIZING THE SALE OF THE DATA COOLING ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (C) APPROVING EXPENSE REIMBURSEMENT; (D) APPROVING SETTLEMENT AND RELEASE OF CLAIMS WITH KYOTOCOOLING NORTH AMERICA LLC; AND (E) GRANTING RELATED <u>RELIEF</u>**

Upon the motion (the "Sale Motion")[2] of Data Cooling Technologies LLC ("DCT"), one

of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for,

---

[1] The Debtors and the last four digits of each of the Debtors' tax identification numbers following in parentheses are: Data Cooling Technologies LLC (3425); and Data Cooling Technologies Canada LLC (3172).

{7098572: }

among other things, entry of an order (this "Sale Order") (a) authorizing and approving DCT's entry into that certain Asset Purchase Agreement, Settlement Agreement and Release dated November 8, 2017 with KyotoCooling North America LLC ("KCNA"), together with all related documents, agreements, exhibits, schedules, and addenda thereto (as may be amended, the "APA"), a copy of which is attached hereto as <u>Exhibit A</u>, approving the sale (the "Sale") of substantially all of DCT's assets used in the Data Cooling Business (as more specifically described and set forth in Section 2.1 of the APA) (collectively, the "Data Cooling Assets"), free and clear of all liens, claims, encumbrances and interests of any kind to KCNA; (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases (the "Assumed Contracts")[3] of DCT that are to be assumed and assigned to KCNA in connection with the Sale, subject to and at the time of the Closing of the Sale; (c) approving the Expense Reimbursement; (d) approving the Estate Releases; and (e) granting related relief, Docket No. 162; and the Court having reviewed (i) the Limited Objection to the Sale Motion, Docket No. 191 (the "Holder Objection"), filed by Holder Construction Group LLC; (ii) the Limited Objection of Turner Construction Company and Turner Logistics, LLC to: (i) Notice to Counterparties to Executory Contracts and Unexpired Leases that Will be Assumed and Assigned, and (ii) the Sale Motion, Docket No. 194 (the "Turner Objection"), filed by Turner Construction Company and Turner Logistics, LLC; (iii) the Response of TSS Technologies, Inc. to the Sale Motion, Docket No. 195 (the "TSS Response"), filed by TSS Technologies, Inc.; (iv) the Limited Objection and Reservation of Rights of Air Ent (OH) LLC to the Sale Motion, Docket No. 196 (the "Air Ent Objection"), filed by Air Ent (OH) LLC; (v) the Limited Objection

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the APA (as defined below) or, if not defined in the APA, the Sale Motion.
[3] The term "Assumed Contracts" as used herein shall refer only to those agreements listed on Schedule 2.1(c) of the APA, as such schedule may be amended through Closing.

{7098572: }

2

of WCC Construction Canada, ULC o/a Walsh Canada to (i) Notice to Counterparties to Executory Contracts and Unexpired Leases That Will Be Assumed and Assigned and (ii) the Sale Motion, Docket No. 197 (the "Walsh Objection"), filed by WCC Construction Canada, ULC o/a Walsh Canada ("Walsh"); (vi) the Notification of Proceedings, Docket No. 198, filed by Prevost Fortin D'Aoust (the "Carmichael Notice"); (vii) the Limited Objection to the Sale Motion, Docket No. 200, filed by the Ohio Department of Job and Family Services (the ODJFS Objection"); (viii) the Notice to Counterparties to Executory Contracts and Unexpired Leases That Will Be Assumed and Assigned, Docket No. 164 (the "Original Contract Assumption Notice"); (ix) the Notice to Counterparties to Executory Contracts and Unexpired Leases That Will Be Assumed and Assigned, Docket No. 201 (the "Amended Notice"); (x) the Amended Notice Regarding Cure Cost for CIT Bank, Docket No. 202 (the "CIT Notice" and together with the Amended Notice, the "Final Contract Assumption Notice"); and the Court having heard the arguments of counsel at a hearing on this matter on November 28, 2017 (the "Sale Hearing"); (xi) the Official Committee of Unsecured Creditors' Limited Response to the Proposed Sale Order Related to the KyotoCooling Sale, Docket No. 205 (the "Committee Response"), filed by the Committee; and (xii) the Reply to Limited Response Concerning Proposed Sale Order, Docket No. 209 (the "KCNA Reply"), filed by KCNA; and it appearing that adequate and proper notice of the Sale Motion has been given and that no other or further notice need be given; and the Sale Hearing having been held to consider the relief requested in the Sale Motion; and upon the record of the Sale Hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Sale Motion is in the best interests of DCT, its estate, its creditors and all other parties in interest; and that the legal and factual bases set forth in the Sale Motion, and any testimony adduced at the Sale Hearing establishing just

cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

## IT IS HEREBY FOUND AND DETERMINED THAT:[4]

A.      Jurisdiction.   The Court has jurisdiction to hear and determine the Sale Motion and to grant the relief requested in the Sale Motion pursuant to 28 U.S.C. § 157(b)(1).

B.      Venue.   Venue of this case and the Sale Motion in this district is proper under 28 U.S.C. § 1408.   This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

C.      Statutory Predicates.   The statutory and legal predicates for the relief requested in the Sale Motion are sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9006, 9014  and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

D.      Notice.   Notice of the proposed Sale of the Data Cooling Assets and the Sale Hearing has been provided to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee for the Northern District of Ohio; (ii) counsel for the Committee; (iii) counsel to KeyBank, N.A.; (iv) the District Director of Internal Revenue; (v) all entities known, as of the date of this Motion, to have a lien, or to have asserted a lien, on the Data Cooling Assets; (vi) KCNA; (vii) all parties asserting reclamation claims; (viii) all of DCT's creditors; (ix) counterparties to the Assumed Contracts; (x) all other parties requesting notice in the Debtors' chapter 11 cases (collectively, the "Notice Parties").

E.      Notice Sufficient.   Based upon the affidavits of service previously filed with the Court and the evidence presented at the Sale Hearing, adequate and sufficient notice of the Sale Motion, Sale Hearing, the Sale, and the transactions contemplated thereby, including

---

[4] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law.  *See* Fed. R. Bankr. P. 7052.

without limitation, the assumption and assignment of the Assumed Contracts to KCNA, has been provided in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9006 and Bankruptcy Rule 6004-1. A reasonable opportunity to object and be heard with respect to the Sale, the Sale Motion and the relief requested therein, the assumption and assignment of the Assumed Contracts to KCNA and the amounts necessary under section 365(b) of the Bankruptcy Code to cure defaults thereunder, as such amounts have been transmitted pursuant to a written notice delivered to the applicable respective counterparty, has been afforded to all interested persons and entities, including the Notice Parties.

       F.    <u>Data Cooling Assets Property of the Estate</u>. The Data Cooling Assets sought to be transferred and/or assigned by DCT to KCNA pursuant to the APA are property of DCT's estate and title thereto is vested in DCT's estate.

       G.    <u>Sufficiency of Marketing</u>. Based upon the record of DCT's chapter 11 case, all creditors and other parties in interest and all prospective buyers have been afforded a reasonable and fair opportunity to bid for the Data Cooling Assets. Under the circumstances, DCT and its professionals have adequately and appropriately marketed the Data Cooling Assets.

       H.    <u>Corporate Authority</u>. Subject to the entry of this Sale Order, DCT: (i) has full power and authority to execute the APA and all other documents contemplated thereby; (ii) has all of the power and authority necessary to consummate the transactions contemplated by the APA, and (iii) has taken all company action necessary to authorize and approve the APA and the sale of the Data Cooling Assets, and any actions required to be performed by DCT in order to consummate the transactions contemplated in the APA. No consents or approvals, other than those expressly provided for in the APA or this Sale Order, are required for DCT to consummate the Sale.

I.     <u>Arm's Length Sale and KCNA's Good Faith</u>.  The APA was negotiated and is undertaken by DCT and KCNA at arm's length without collusion or fraud, and in good faith within the meaning of section 363(m) of the Bankruptcy Code.  Neither KCNA nor any of its affiliates, members, officers, directors, or shareholders is an "insider" of either of the Debtors as that term is defined by section 101(31) of the Bankruptcy Code.  KCNA (i) recognized that DCT was free to deal with any other party interested in acquiring the Data Cooling Assets and (ii) willingly subjected the Data Cooling Assets to higher and better offers in accordance with DCT's fiduciary duties.   All payments to be made by KCNA and other agreements or arrangements entered into by KCNA in connection with the Sale have been disclosed, KCNA has not violated section 363(n) of the Bankruptcy Code by any action or inaction, and no common identity of directors or controlling stockholders exists between KCNA and DCT.  As a result of the foregoing, KCNA is a "good faith buyer" within the meaning of section 363(m) of the Bankruptcy Code, and as such, is entitled to all of the protections afforded thereby, including in the event this Sale Order or any portion thereof is reversed or modified on appeal, and otherwise has proceeded in good faith in all respects in connection with the Sale specifically and this chapter 11 case generally.

J.     <u>Sale Highest or Best Offer</u>.  The offer submitted by KCNA for the Data Cooling Assets as reflected in the APA, including the form and total consideration to be realized thereunder, is the highest and best offer for the Data Cooling Assets.  No other person or entity or group of persons or entities has offered to purchase the Data Cooling Assets for an amount that would provide greater value to DCT than KCNA, including through the reduction of claims against DCT's estate.  The Court's approval of the Sale Motion with respect to the Data Cooling Assets, the APA, and the transactions contemplated herein, maximizes DCT's recovery for the

Data Cooling Assets, and, thus, is in the best interests of DCT and its estate, creditors and all other parties in interest.

K.  No Fraudulent Transfer.  The purchase price set forth in the APA constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and any other applicable law, and may not be avoided under section 363(n) or any other section of the Bankruptcy Code.  The APA was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying or defrauding creditors of DCT under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither DCT nor KCNA has entered into the APA or is consummating the Sale with any fraudulent or otherwise improper purpose.

L.  No Liability under Section 363(n).  Neither DCT nor KCNA engaged in any conduct that would cause or permit the APA or the consummation of the Sale to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

M.  Transfer of Data Cooling Assets Free and Clear.  DCT is the sole and lawful owner of the Data Cooling Assets.  Subject to section 363(f) of the Bankruptcy Code, and except as otherwise provided in the APA and this Sale Order, and except for Assumed Liabilities and Permitted Liens, the transfer of each of the Data Cooling Assets to KCNA will be, as of the Closing, a legal, valid, and effective transfer of the Data Cooling Assets, which transfer vests or will vest KCNA with all right, title, and interest of DCT to the Data Cooling Assets free and clear of, among other things, (i) all liens, claims, mortgages, deeds of trust, pledges, charges, security interests, rights of first refusal, hypothecations, encumbrances, royalties, easements, servitudes, leases or subleases, rights-of-way, encroachments, restrictive covenants, restrictions

on transferability or other similar restrictions, rights of offset or recoupment, right of use or permission, subleases, leases, conditional sale arrangements; (ii) all claims as defined in section 101(5) of the Bankruptcy Code) including all rights or causes of action (whether in law or equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of DCT or any other person prior to Closing, consent rights, options, contract rights, covenants, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of DCT's chapter 11 case, and whether imposed by agreement, understanding, law, equity or otherwise, and (iii) all debts, liabilities, obligations, contractual rights and claims and labor, employment and pension claims, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material on non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of DCT's chapter 11 case, and whether imposed by agreement, understanding, law, equity or otherwise (clauses (i), (ii), and (iii), together, the "Interests").

N.    <u>Free and Clear Findings Required by KCNA</u>. KCNA would not have entered into the APA and would not consummate the transactions contemplated thereby if the Sale was not free and clear of any and all Interests (other than Assumed Liabilities and Permitted Liens) pursuant to section 363(f) of the Bankruptcy Code, or if KCNA would, or in the future could, be liable for any of such Interests.  Effective upon the Closing, KCNA shall not be responsible for any Interests (other than Assumed Liabilities and Permitted Liens), including in

respect of the following: (i) labor or employment agreements; (ii) all mortgages, deeds of trust, and security interests; (iii) any intercompany loans and receivables between the Debtors and any non-Debtor affiliate; (iv) any welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of DCT, or any affiliate of DCT; (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) the Worker Adjustment and Retraining Notification Act, 29 U.S.C §§ 2101 *et. seq.*, or (l) any other state or federal benefits or claims relating to any employment with DCT or any of its predecessors; (vi) Interests arising under any environmental, health and safety laws with respect to any assets owned or operated by DCT or any corporate predecessor at any time prior to the Closing and any liabilities of DCT other than the Assumed Liabilities and Permitted Liens; (vii) any bulk sales or similar law; (viii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (ix) any and all Interests arising out of violations, or other non-compliance with any law(s), regulation(s), standard(s), guideline(s), enforcement order(s), or any other authority or requirement enforced by, or under the supervision of the Occupational Safety and Health Administration; and (x) any theories of successor liability or causes of action related thereto. A

sale of the Data Cooling Assets other than one free and clear of all Interests would yield substantially less value for DCT's estate, with less certainty, than the Sale as contemplated. Therefore, the Sale contemplated by the APA maximizes DCT's recovery on the Data Cooling Assets, and, thus, is in the best interests of DCT and its estate, creditors and all other parties in interest.

        O.      <u>Satisfaction of Section 363(f) Standards</u>.  DCT may sell the Data Cooling Assets free and clear of all Interests because, with respect to each creditor or other person or entity asserting an Interest, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Interests who did not object (or who ultimately withdrew their objections, if any) to the Sale or the Sale Motion with respect to the Data Cooling Assets are deemed to have consented to the Sale Motion with respect to the Data Cooling Assets and to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.

        P.      <u>No Successor Liability</u>.  KCNA is not holding itself out to the public as a continuation of DCT and is not an "insider" or "affiliate" of DCT, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or stockholders exists now or has ever existed between KCNA and DCT.  The conveyance of the Data Cooling Assets does not amount to a consolidation, merger or *de facto* merger of KCNA and DCT and/or DCT's estate, there is not substantial continuity between KCNA and DCT, there is no continuity of enterprise between DCT and KCNA, KCNA is not a joint employer or co-employer with DCT or a mere continuation of DCT or its estate, and KCNA does not constitute a successor to DCT or its estate.  To the fullest extent of the law, KCNA's acquisition of the Data Cooling Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing.  KCNA's operations shall not be

deemed a continuation of DCT's business as a result of the acquisition of the Data Cooling Assets. KCNA would not have acquired the Data Cooling Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

Q.    Assumed Contracts.  Each and every provision of the Assumed Contracts or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Assumed Contract has been satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code.  There shall be no rent accelerations, assignment fees, increases or any other fees charged to DCT or KCNA as a result of the assumption and/or assignment of the Assumed Contracts.  All counterparties of the Assumed Contracts who did not or do not timely file an objection to the assumption and assignment of the Assumed Contract(s) to which they are counterparty are deemed to consent to the assumption by DCT of their respective Assumed Contract(s) and the assignment thereof to KCNA, and KCNA shall enjoy all of the rights and benefits under each such Assumed Contract as of the applicable date of assumption and assignment without the necessity of obtaining such non-debtor party's written consent to the assumption or assignment thereof.  Upon the assignment to KCNA pursuant to the APA, the Assumed Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order, and shall be assigned and transferred to KCNA, notwithstanding any provision in the Assumed Contracts prohibiting or otherwise restricting assignment or transfer.  DCT has demonstrated that it is an exercise of its sound business judgment to assume and assign the Assumed Contracts to KCNA in connection with the consummation of the Sale, and the assumption and assignment of the Assumed Contracts is in the best interests of DCT, its estate and creditors, and other parties in interest.  The Assumed Contracts being assigned to

KCNA are an integral part of the Sale and, accordingly, their assumption and assignment are reasonable and an enhancement to the value of DCT's estate. Notwithstanding any other provision of this Order, the License Agreement is deemed to have terminated prepetition.

R. Cure/Adequate Assurance. The Cure Costs will be paid in accordance with the terms of the APA. KCNA has demonstrated adequate assurance of future performance of all Assumed Contracts within the meaning of section 365 of the Bankruptcy Code, including its promise to perform DCT's obligations under the Assumed Contracts for periods on and after the Closing. The Cure Costs are deemed the amounts necessary to "cure" all "defaults" (each, within the meaning of section 365(b) of the Bankruptcy Code) under such Assumed Contracts. Any objections to the Cure Costs, to the extent not otherwise resolved, are hereby overruled. To the extent that any counterparty failed to timely object to its Cure Costs or the assignment of its Assumed Contract or to raise any other alleged default or breach of contract, such counterparty is deemed to have consented to such Cure Cost and to the assignment of its respective Assumed Contract to KCNA and to have waived any other defaults or breaches. The payment of the Cure Costs as provided in the APA is appropriate and is deemed to fully satisfy DCT obligations under sections 365(b) and 365(f) of the Bankruptcy Code. Accordingly, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption by DCT, and the assignment by DCT to KCNA, of each of the Assumed Contracts.

S. Data Cooling Assets Assignable. Any contractual provision or applicable non-bankruptcy law that purports to prohibit, restrict, or condition assignment of any of the Data Cooling Assets has been satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code.

T.    <u>Sale as Exercise of Business Judgment</u>.  Entry into and consummation of the APA constitute the exercise by DCT of sound business judgment, and such acts are in the best interests of DCT, its estate and creditors, and all parties in interest.  The Court finds that DCT has articulated good and sufficient business reasons justifying the Sale.  Additionally: (i) the APA constitutes the highest and best offer for the Data Cooling Assets; (ii) the APA and the closing thereon presents the best opportunity to realize the maximum value of the Data Cooling Assets and avoid a decline and devaluation of the Data Cooling Assets; (iii) there is risk of deterioration of the value of the Data Cooling Assets if the Sale is not consummated promptly; and (iv) the APA and the closing thereon will provide a greater recovery for DCT's creditors than would be provided by any other presently available alternative.  DCT has demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization.

U.    <u>Compelling Reasons for an Immediate Sale</u>.  Good and sufficient reasons for approval of the APA have been articulated by DCT.  DCT has demonstrated compelling circumstances for the Sale outside: (a) the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code; and (b) a plan of reorganization, in that, among other things, the immediate consummation of the Sale is necessary and appropriate to preserve and to maximize the value of DCT's estate.  To maximize the value of the Data Cooling Assets and to preserve the viability of the business to which the Data Cooling Assets relate, it is essential that the Sale occur promptly.  Time is of the essence in consummating the Sale.

V.    <u>Estate Releases Appropriate</u>.  The settlement of all claims and causes of action and the Estate Releases provided in the APA satisfy the requirements for a compromise of claims under Bankruptcy Rule 9019.

W. <u>No Sub Rosa Plan</u>. The Sale does not constitute a *sub rosa* chapter 11 plan. The Sale neither impermissibly restructures the rights of DCT's creditors nor impermissibly dictates the terms of a plan of reorganization for DCT.

X. <u>Final Order</u>. This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order and expressly directs entry of judgment as set forth herein.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1. <u>Sale Motion Granted</u>. The relief requested in the Sale Motion with respect to the Data Cooling Assets is GRANTED and the Sale is approved, all as set forth in this Sale Order.

2. <u>Holder Objection</u>. The Holder Objection was resolved by the Final Contract Assumption Notice and the record of the Sale Hearing, and is therefore moot as stated on the record at the Sale Hearing.

3. <u>Turner Objection</u>. The Turner Objection was resolved by the Final Contract Assumption Notice, whereby the Turner Construction Company and Turner Logistics contracts were removed from the Assumed Contracts, and the record of the Sale Hearing, and is therefore resolved as stated on the record at the Sale Hearing and as provided in this Order. To the extent KCNA attempts to bring claims against Turner Construction Company and/or Turner Logistics arising out of those contracts, then Turner Construction Company and Turner Logistics may assert all offset claims and defenses against KCNA, but limited to the full amount of the claims made by KCNA against Turner Construction Company and Turner Logistics such that as between Turner Construction Company and Turner Logistics, on the one hand, and KCNA, on the other hand, Turner Construction Company and Turner Logistics will be limited to a full

offset against KCNA and cannot obtain or recover on any claim against KCNA that would require KCNA to pay money damages.

4. <u>TSS Objection</u>. The TSS Objection was resolved by the Final Contract Assumption Notice, the additional language integrated into this Sale Order and agreed to by the parties, and is therefore resolved as stated on the record at the Sale Hearing.

5. <u>Air Ent Objection</u>. The Air Ent Objection was rendered moot as a result of DCT's lease with Air Ent (OH) LLC being removed from the list of contracts to be assumed and assigned in connection with the Sale, as reflected in the Final Contract Assumption Notice.

6. <u>Walsh Objection</u>. The Walsh Objection was resolved by the Final Contract Assumption Notice, the additional language integrated into this Sale Order and agreed to by the parties, and the record of the Sale Hearing, and is therefore resolved as stated on the record at the Sale Hearing. Pursuant to agreement between DCT and Walsh, the Walsh Contract, attached as <u>Exhibit 1</u> to the Walsh Objection (the "Walsh Contract"), shall be, and hereby is, deemed rejected, effective as of the date of this Sale Order. As of the date of this Sale Order, DCT and its estate shall hereby be relieved from any further administrative expense liability with respect to the Walsh Contract. Nothing herein shall be deemed to limit or otherwise affect Walsh's right to assert an administrative expense claim for postpetition claims arising prior to the date of this Sale Order or DCT's or any other party in interest's right to object to any such claims.

7. <u>Carmichael Notice</u>. The Carmichael Notice is hereby overruled to the extent it responds to the relief requested in the Sale Motion.

8. <u>ODJFS Objection</u>. The ODJFS Objection is resolved by the additional language regarding state unemployment compensation experience ratings, account balances, and

contribution rates integrated into this Sale Order and agreed to by the parties, and is therefore resolved as stated on the record at the Sale Hearing.

9.    <u>Committee Response and KCNA Reply</u>. The Committee Response and the KCNA Reply are deemed resolved by the additional language integrated into this Sale Order and agreed to by the parties.

10.    <u>Any Other Objections Overruled</u>. Any other objections with regard to the relief sought in the Sale Motion with respect to the Data Cooling Assets that have not been withdrawn, waived, settled or otherwise dealt with as expressly provided herein or on the record at the Sale Hearing are hereby overruled on the merits, with prejudice.

11.    <u>Approval</u>. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the APA, the assumption and assignment of the Assumed Contracts to KCNA as of the Closing Date, and the sale of the Data Cooling Assets and the other transactions contemplated thereby are hereby approved in all respects. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, DCT and its officers, agents, professionals and other representatives are authorized and directed to perform their obligations under, and comply with the terms of, the APA, and to consummate the Sale, including the sale, transfer and assignment of all of DCT's right, title and interest in the Data Cooling Assets to KCNA free and clear of any and all Interests (other than the Assumed Liabilities and Permitted Liens) in accordance with the terms of the APA and this Sale Order. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, DCT, KCNA and each of their respective officers, directors, employees, professionals, agents and other representatives are each hereby authorized and directed to take any and all actions necessary or appropriate to: (a) consummate the sale of the Data Cooling Assets to KCNA and the Closing of the Sale, pursuant to the APA and this Sale Order; (b) assume and assign the Assumed Contracts to be

assumed and assigned to KCNA as of the Closing Date; and (c) perform, consummate, implement and close fully the APA together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement the APA. DCT and KCNA are hereby authorized and directed to perform their respective covenants and undertakings as provided in the APA prior to or after the Closing of the Sale without further order of the Court. KCNA and DCT shall have no obligation to close the Sale except as is contemplated and provided for in the APA.

12. <u>Transfer Free and Clear</u>. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, upon the Closing, neither KCNA nor its respective successors and assigns shall have any liability for any Interest, except for the Assumed Liabilities and Permitted Liens, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, whether as a successor, vicariously or otherwise, of any kind, nature or character whatsoever, including for any Interests arising under, without limitation: (i) any labor or employment agreements; (ii) all mortgages, deeds of trust and security interests; (iii) any intercompany loans and receivables between the Debtors and any non-Debtor affiliate; (iv) any welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan, or any affiliate of DCT; (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of

1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) the Worker Adjustment and Retraining Notification Act, 29 U.S.C §§ 2101 et. seq., or (l) any other state or federal benefits or claims relating to any employment with DCT or any of its predecessors; (vi) Interests arising under any environmental, health and safety laws with respect to any assets owned or operated by DCT or any corporate predecessor at any time prior to the Closing Date and any liabilities of DCT other than the Assumed Liabilities and Permitted Liens; (vii) any bulk sales or similar law; (viii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (ix) any and all Interests arising out of violations, or other non-compliance with any law(s), regulation(s), standard(s), guideline(s), enforcement order(s), or any other authority or requirement enforced by, or under the supervision of the Occupational Safety and Health Administration; and (x) any theories of successor liability or causes of action related thereto. All Interests, to the extent not paid in full at Closing, shall attach to the proceeds of the sale of the Data Cooling Assets, in the order of priority, with the same validity, force and effect which they now have as against the Data Cooling Assets, subject to any rights, claims and defenses that DCT and other parties in interest may possess with respect thereto. This Sale Order is neither binding nor determinative in any fashion on the issue whether any "Interest" or "Interests" to which the Data Cooling Assets are being transferred free and clear includes unemployment compensation experience ratings, account balances, or contribution rates with regard to the State of Ohio Department of Job and Family Services.

13. <u>Surrender of Possession</u>. Any and all Data Cooling Assets in the possession or control of any third party, person or entity, including in the control of any shipper, custodian, vendor, supplier or employee of DCT, shall be transferred to KCNA free and clear of all Interests

(unless otherwise agreed to in writing by KCNA), except for the Assumed Liabilities and Permitted Liens, and shall be delivered to KCNA and deemed delivered at the time of Closing (or such other time as provided in the APA).

14.     Valid Transfer.  Effective upon the Closing, the transfer to KCNA of DCT's right, title and interest in the Data Cooling Assets pursuant to the APA shall be, and hereby is deemed to be, a legal, valid and effective transfer of DCT's right, title and interest in the Data Cooling Assets, and vests with or will vest in KCNA all right, title and interest of DCT in the Data Cooling Assets, free and clear of all Interests (other than the Assumed Liabilities and Permitted Liens).

15.     Injunction.  Except as expressly provided in the APA or this Sale Order, effective upon the Closing all persons and entities, including, but not limited to, all debt security holders, equity security holders, holders of any preferential purchase rights or similar rights, including, but not limited to tag along rights, drag along rights and co-sale rights, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants and other persons holding Interests (other than the Assumed Liabilities and Permitted Liens) against or in DCT or DCT's interests in the Data Cooling Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of DCT's chapter 11 case, whether imposed by agreement, understanding, law, equity or otherwise), shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such Interests against KCNA, or its affiliates, agents, advisors, representatives, officers, successors and assigns, the Data Cooling Assets, or the interests of DCT or KCNA in such Data Cooling Assets, including, without limitation, taking

any of the following actions with respect to an Interest (other than, with respect to KCNA, only Assumed Liabilities and Permitted Liens): (a) commencing or continuing in any manner any action or other proceeding against such parties or the Data Cooling Assets; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against such parties or the Data Cooling Assets; (c) creating, perfecting or enforcing any liens, claims, encumbrances or other interests against such parties or the Data Cooling Assets; (d) asserting a Claim as a setoff, right of subrogation or recoupment of any kind against any obligation due KCNA or its affiliates, agents, advisors, representatives, officers, successors or assigns; or (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Sale Order or the agreements or actions contemplated or taken in respect thereof. All persons are hereby enjoined from taking any action that would interfere with or adversely affect DCT's ability to transfer the Data Cooling Assets in accordance with the terms of the APA and this Sale Order. Following the Closing, no holder of an Interest (including as such term is used in section 363(f)) against DCT shall interfere with KCNA's title to or use and enjoyment of the Data Cooling Assets.

16. <u>Good Faith Buyer</u>. The APA has been entered into by KCNA in good faith and KCNA is a good faith buyer of the Data Cooling Assets as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization of the Sale provided herein shall neither affect the validity of the Sale nor the transfer of the Data Cooling Assets to KCNA, free and clear of Interests, unless such authorization is duly stayed before the Closing pending such appeal. KCNA is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

17-52170-amk    Doc 211    FILED 11/30/17    ENTERED 11/30/17 09:56:11    Page 20 of 62

17.    No Bulk Sales.   No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the APA, the Sale Motion and this Sale Order.

18.    Fair and Equivalent Value.   The consideration provided by KCNA for the Data Cooling Assets under the APA shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and the Sale may not be avoided, or costs or damages imposed or awarded under section 363(n) or any other provision of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act or any other similar state laws.  The APA provides for the release by KCNA of all claims by KCNA against DCT as part of a mutual release. Once the provisions of Section 5.11(d) of the APA are effective pursuant to the terms set forth in the APA, all claims by KCNA against DCT shall be released and this Sale Order shall be considered evidence of such for the purposes of the official claims register in DCT's chapter 11 case.

19.    Transfer of Marketable Title.   Upon the Closing, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of all of DCT's right, title and interest in the Data Cooling Assets and/or a bill of sale transferring good and marketable title in such Data Cooling Assets to KCNA at the Closing pursuant to the terms of the APA, free and clear of all Interests (other than Assumed Liabilities and Permitted Liens).

20.    No Successor Liability.   The consummation of the Sale does not amount to a consolidation, merger or *de facto* merger of KCNA and DCT and/or its estate, there is not substantial continuity between KCNA and DCT, there is no continuity of enterprise between DCT and KCNA, KCNA is not a mere continuation of DCT or its estate, and KCNA does not

constitute a successor to DCT or its estate.  Upon the Closing, to the fullest extent of the law, KCNA's acquisition of the Data Cooling Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the time of the Closing.  KCNA operations shall not be deemed a continuation of DCT's business as a result of the acquisition of the Data Cooling Assets.  The transfer of the Data Cooling Assets to KCNA, except as otherwise set forth in the APA, does not, and will not, subject KCNA to any liability whatsoever, with respect to operation of DCT's business prior to the Closing.

21.    <u>Authorization to Assign</u>.  Pursuant to section 365(f) of the Bankruptcy Code, and notwithstanding any provision of any contract governing the Data Cooling Assets or any Assumed Contract to be assumed and assigned to KCNA or applicable non−bankruptcy law that prohibits, restricts, or conditions the assignment of the Data Cooling Assets or the Assumed Contracts, DCT is authorized to (a) assign, sell and transfer the Data Cooling Assets to KCNA and (b) assume and assign the Assumed Contracts to KCNA pursuant to the APA, which assignments shall take place on and be effective as of the Closing or as otherwise provided by a separate order of this Court.

a.    There shall be no accelerations, assignment fees, increases, or any other fees charged to KCNA or DCT as a result of the assumption and assignment of the Assumed Contracts.

b.    DCT has met all of the requirements of section 365(b) of the Bankruptcy Code for each of the Assumed Contracts to be assumed and assigned to KCNA as of Closing. Notwithstanding the foregoing, unless required by KCNA under the APA, DCT shall not be required by the Court to assume and assign any Assumed Contracts, and, if no such assumption

and assignment occurs, no Cure Costs shall be due and no adequate assurance of future performance shall be required.

   c. DCT is authorized to execute and deliver to KCNA such agreements, documents and other instruments as may facilitate or document the sale, assignment, transfer, conveyance and delivery of the Assumed Contracts to KCNA.

   22. <u>Assumed Contracts</u>. As of the Closing, subject to the provisions of this Sale Order and the APA, KCNA shall succeed to the entirety of DCT's rights and obligations in the Assumed Contracts to be assumed and assigned to KCNA first arising and attributable to the time period occurring on or after the Closing Date and shall have all rights thereunder. Each counterparty to an Assumed Contract hereby is forever barred, estopped, and permanently enjoined from raising or asserting against DCT or KCNA, or the property of either of them, any assignment fee, default, breach or claim of pecuniary loss, or condition to assignment, arising under or related to the Assumed Contracts, existing as of the date of the Sale Hearing, or arising by reason of the consummation of transactions contemplated by the APA, including the Sale and the assumption and assignment of the Assumed Contracts. Any party that may have had the right to consent to the assignment of an Assumed Contract is deemed to have consented to such assignment for purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code if such party failed to object to the assumption and assignment of such Assumed Contract. Further, to the extent the TSS Technologies, Inc. Manufacturing Agreement (the "Manufacturing Agreement") is an executory contract that may be assumed and assigned pursuant to the provisions detailed in this Sale Order and was not terminated prepetition, the Manufacturing Agreement is an Assumed Contract. TSS reserves all rights with respect to this issue, including the ability to file a proof of claim for distributions in the event it is determined that the Manufacturing Agreement is not an

Assumed Contract.  Notwithstanding the Cure Cost stated in the Final Contract Assumption Notice for the Manufacturing Agreement, the Cure Cost for the Manufacturing Agreement shall be $0.00.

        a.        Upon Closing, and pursuant to the APA (i) all defaults (monetary and non-monetary) under the Assumed Contracts shall be deemed cured and satisfied in full through the payment of the Cure Costs; (ii) no other amounts will be owed by DCT, its estate or KCNA with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing with respect to the Assumed Contracts, unless otherwise agreed to in writing by KCNA; and (iii) any and all persons or entities shall be forever barred and estopped from asserting a claim against DCT, its estate, KCNA, or the Data Cooling Assets, that any additional amounts are due or that any defaults exist under the Assumed Contracts that arose or accrued, or relate to or are attributable to the period before the Closing, whether declared or undeclared, or known or unknown.  KCNA's promise pursuant to the terms of the APA to pay the Cure Costs and to perform DCT's obligations under the Assumed Contracts for the period on or after the Closing shall constitute adequate assurance of its future performance under the Assumed Contracts being assigned to it as of the Closing within the meaning of sections 365(b)(l)(C) and 365(f)(2)(B) of the Bankruptcy Code.

        b.        Upon assumption of the Assumed Contracts, such Assumed Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order, and shall be assigned and transferred to KCNA notwithstanding any provision in such Assumed Contracts or other restrictions prohibiting assignment or transfer.  The assumption and assignment of the Assumed Contracts as authorized under this Sale Order will take effect as of the Closing.  Furthermore, other than the Assumed

Contracts, no other executory contract or unexpired lease shall be deemed assumed by DCT and assigned to KCNA pursuant to section 365 of the Bankruptcy Code. The failure of DCT or KCNA to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of DCT's or KCNA's rights to enforce every term and condition of such Assumed Contract.

       c.     All counterparties to the Assumed Contracts to be assumed and assigned to KCNA as of the Closing shall cooperate and expeditiously execute and deliver, upon the reasonable request of KCNA, and shall not charge DCT or KCNA for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the transactions contemplated herein.

       d.     Notwithstanding any other provision of this Order, the License Agreement is deemed to have terminated prepetition.

       e.     To the extent that KCNA attempts to bring claims against any of the account debtors whose accounts receivable are purchased by KCNA pursuant to the terms of the APA (the "Account Debtors"), such Account Debtor may assert all offset claims and defenses against KCNA, but limited to the full amount of the claims made by KCNA against such Account Debtor such that as between such Account Debtor, on the one hand, and KCNA, on the other hand, such Account Debtor will be limited to a full offset against KCNA and cannot obtain or recover on any claim against KCNA that would require KCNA to pay money damages.

       23.    <u>Release of Interests</u>. Effective upon the Closing, this Sale Order: (a) is and shall be effective as a determination that all Interests (other than Assumed Liabilities and Permitted Liens) of any kind or nature whatsoever existing as to the Data Cooling Assets prior to the

Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected; (b) is and shall be binding upon and shall govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Data Cooling Assets conveyed to KCNA, and all recorded Interests (other than Assumed Liabilities and Permitted Liens) against the Data Cooling Assets shall be deemed stricken from such entities' records, official and otherwise.

24.    <u>Approval to Release Interests</u>.  If any person or entity that has filed financing statements, mortgages, mechanic's liens or other documents or agreements evidencing Interests in, Liens on, or claims against the Data Cooling Assets shall not have delivered to DCT before the Closing, in proper form for filing and executed by the appropriate parties, the appropriate documentation with respect to the release of such Interests, DCT and KCNA are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Data Cooling Assets. KCNA is hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Interests against the Data Cooling Assets other than the Assumed Liabilities and Permitted Liens. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or

recording system of each and every federal, state or local government agency, department or office.

25. <u>Allocation of Data Cooling Assets</u>. KCNA is hereby authorized in connection with the consummation of the Sale to allocate the Data Cooling Assets, including the Assumed Contracts, among its affiliates, designees, assigns, and/or successors, in a manner as it in its sole discretion deems appropriate, and to assign, lease, sublease, license, sublicense, transfer, or otherwise dispose of any of the Data Cooling Assets, including the Assumed Contracts, to its affiliates, designees, assignees and/or successors with all of the rights and protections accorded to KCNA under this Sale Order and the APA with respect thereto. DCT shall cooperate with and take all actions reasonably requested by KCNA to effectuate any of the foregoing.

26. <u>Rule 9019 Settlement; Estate Releases</u>. Pursuant to Bankruptcy Rule 9019 and in consideration for the benefits provided under, described in, contemplated by, and/or implemented by APA, each of the Estate Releases described in Section 5.11 of the APA constitute good faith compromises and settlements of the matters covered thereby. The Estate Releases shall be, and hereby are, approved as fair, equitable, reasonable and in the best interests of DCT, its estate, and its creditors. Such compromises and settlements are made in exchange for consideration and are in the best interest of DCT and KCNA, are within the range of possible litigation outcomes, are fair, equitable, reasonable and are integral elements of the resolution of DCT's chapter 11 case. The failure to effect the settlement and release provisions of the APA would seriously impair DCT and KCNA's ability to consummate the transactions contemplated by the APA. Accordingly, the compromises and settlements embodied in the APA are approved.

27. <u>Governmental Authorization to Effectuate Sale and Assignments</u>. Each and every federal, state and governmental agency or department, and any other person or entity, is hereby

authorized to accept any and all documents and instruments in connection with or necessary to consummate the transactions contemplated by the APA. No governmental unit may revoke or suspend any lawful right, license, trademark or other permission relating to the use of the Data Cooling Assets sold, transferred or conveyed to KCNA on account of the filing or pendency of DCT's chapter 11 case or the consummation of the transactions. For the avoidance of doubt, the sale of the Data Cooling Assets authorized herein shall be of full force and effect, regardless of whether DCT or any of its affiliates lack good standing in any jurisdiction in which such entity is formed or is authorized to transact business.

28. <u>Authorization of KCNA to Operate</u>. To the greatest extent available under applicable law and to the extent provided for under the APA, KCNA shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization or approval of DCT with respect to the Data Cooling Assets, and, to the greatest extent available under applicable law and to the extent provided for under the APA, all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to KCNA as of the Closing.

29. <u>Inconsistencies with Prior Orders, Pleadings or Agreements</u>. To the extent this Sale Order is inconsistent with any prior order or pleading with respect to the Motion in the Debtors' chapter 11 cases, the terms of this Sale Order shall govern. To the extent there is any inconsistency between the terms of this Sale Order and the terms of the APA (including all ancillary documents executed in connection therewith), the terms of the APA shall govern. For the avoidance of doubt, nothing in this Sale Order shall be deemed to modify of supersede the Final Order Authorizing the Use of Cash Collateral and Providing Adequate Protection, Docket No. 84.

30.     _Binding Effect of Sale Order; Subsequent Orders_.  This Sale Order and the APA shall be binding in all respects upon DCT, its estate, all creditors of, and holders of equity interests in, DCT, any holders of Liens, claims or other Interests in, against or on all or any portion of the Data Cooling Assets (whether known or unknown), KCNA and all successors and assigns of KCNA, all successors and assigns to the Data Cooling Assets and any trustee, examiner, "responsible person" or other fiduciary appointed in this chapter 11 case or upon a conversion to chapter 7 under the Bankruptcy Code.  The APA shall not be subject to rejection or avoidance under any circumstances.  If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that this Sale Order, including the rights granted to KCNA hereunder, shall remain effective and, notwithstanding such conversion or dismissal, shall remain binding on parties in interest.  This Sale Order shall not be modified by any chapter 11 plan confirmed in this chapter 11 case or any subsequent order(s) of this Court.

31.     _Failure to Specify Provisions_.  The failure specifically to include or make reference to any particular provisions of the APA or any related ancillary document in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA and all related ancillary documents are authorized and approved in their entirety.

32.     _Retention of Jurisdiction_.  The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Sale Order, including, without limitation, the authority to:  (i) interpret, implement and enforce the terms and provisions of this Sale Order (including the exculpation, release and injunctive provisions in this Sale Order) and the terms of the APA, all amendments thereto and any waivers and consents thereunder;

(ii) protect KCNA, or the Data Cooling Assets, from and against any Interests (other than Assumed Liabilities and Permitted Liens); (iii) compel delivery of all Data Cooling Assets to KCNA; (iv) compel DCT and KCNA to perform all of their respective obligations under the APA; and (v) resolve any disputes arising under or related to the APA or the Sale.

33.     <u>Automatic Stay</u>.  KCNA shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other Sale-related document.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Sale Order.

34.     <u>No Material Modifications</u>.  The APA and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof without further order of the Court; <u>provided</u>, <u>however</u>, that any such modification, amendment or supplement is neither material nor materially changes the economic substance of the transactions contemplated hereby. In the event of any modifications to the APA in accordance with this paragraph, DCT shall provide written notice of such modifications to KeyBank, the Committee, and the Office of the United States Trustee.

35.     <u>Immediate Effect</u>.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding any provision in the Bankruptcy Rules to the contrary, the Court expressly finds there is no reason for delay in the implementation of this Sale Order and, accordingly:  (i) the terms of this Sale Order shall be immediately effective and enforceable upon its entry and the fourteen (14) day stay provided in Bankruptcy Rule 6004(h) and Bankruptcy Rule 6006(d) is hereby expressly waived and shall not apply; (ii) DCT is not subject to any stay

17-52170-amk    Doc 211    FILED 11/30/17    ENTERED 11/30/17 09:56:11    Page 30 of 62

in the implementation, enforcement or realization of the relief granted in this Sale Order; and (iii) DCT may, in its discretion and without further delay, take any action and perform any act authorized under this Sale Order.

36. _Provisions Non-Severable_.  The provisions of this Sale Order are nonseverable and mutually dependent.

37. _Satisfaction of Conditions Precedent_.  Neither KCNA nor DCT shall have an obligation to close the transactions contemplated herein until all conditions precedent in the APA to each of their respective obligations to close the transactions have been met, satisfied, or waived in accordance with the terms of the APA.

###

Prepared by:

/s/ Sean D. Malloy
Sean D. Malloy (0073157)
Michael J. Kaczka (0076548)
Maria G. Carr (0092412)
McDONALD HOPKINS LLC
600 Superior Avenue, E., Suite 2100
Cleveland, OH 44114
Telephone:  (216) 348-5400
Facsimile:   (216) 348-5474
E-mail:  smalloy@mcdonaldhopkins.com
        mkaczka@mcdonaldhopkins.com
        mcarr@mcdonaldhopkins.com

COUNSEL FOR DEBTORS
AND DEBTORS IN POSSESSION

**Agreed and Accepted:**

/s/ Daniel A. DeMarco_____
By:  Daniel A. DeMarco
Counsel for KyotoCooling North America, LLC


/s/ Sherri Dahl_____
By:  Sherri Dahl
Counsel for Committee


/s/ Curtis Tuggle_____
By:  Curtis Tuggle
Counsel for KeyBank


/s/ Patrick Vance_____
By: Patrick Vance
Counsel for Holder Construction Group LLC


/s/ David M. Whittaker_____
By:  David M. Whittaker
Counsel for Turner Construction Company and Turner Logistics, LLC


/s/ Jeffrey M. Hendricks_____
By:  Jeffrey M. Hendricks
Counsel for TSS Technologies, Inc.


/s/ Elliot M. Smith_____
By: Elliot M. Smith
Counsel for Air Ent (OH) LLC


/s/ Michael Tucker_____
By:  Michael Tucker
Counsel for WCC Construction Canada, ULC o/a Walsh Canada


/s/ Richard Schroeter_____
By: Richard Schroeter
Counsel for Ohio Department of Job and Family Services

# **<u>EXHIBIT A</u>**

# ASSET PURCHASE AGREEMENT, SETTLEMENT AGREEMENT AND RELEASE

Dated as of November 9, 2017

By and Between

**KyotoCooling North America, LLC**

and

**Data Cooling Technologies, LLC**

9705162.1

## ASSET PURCHASE AGREEMENT, SETTLEMENT AGREEMENT AND RELEASE

ASSET PURCHASE AGREEMENT, SETTLEMENT AGREEMENT AND RELEASE (this "**Agreement**"), is dated as of November 9, 2017, by and between KyotoCooling North America, LLC, a Delaware limited liability company ("**Purchaser**"), and Data Cooling Technologies, LLC, a Delaware company ("**Seller**").

W I T N E S S E T H:

WHEREAS, Seller is engaged in the business of selling cooling systems for data centers in North America (such business, and not the business conducted by Seller defined herein as the Thermotech Business, is hereinafter referred to as the "**Business**");

WHEREAS, Seller filed a petition (the "**Bankruptcy Petition**") on September 8, 2017 initiating a chapter 11 bankruptcy case under Case No. 17-52170 (the "**Chapter 11 Case**") in the United States Bankruptcy Court for the Northern District of Ohio (the "**Bankruptcy Court**");

WHEREAS, Seller desires to sell to Purchaser, and Purchaser desires to purchase and acquire from Seller, pursuant to a sale in accordance with Section 363 of title 11 of the United States Code (the "**Bankruptcy Code**"), upon the terms and subject to the conditions set forth in this Agreement, all of Seller's assets, property, rights and interests related to the Business (other than the Retained Assets (defined below)), in consideration of certain payments by the Purchaser and the assumption by Purchaser of certain Liabilities (defined below) and obligations of Seller specifically described in this Agreement; and

WHEREAS, Seller desires to retain all of its assets, property, rights, interests, Liabilities and obligations not transferred to, or assumed by, Purchaser under this Agreement; and

WHEREAS, Seller and Purchaser desire to settle all of the claims by and between them, and to release one another from liability in respect of such claims, on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual agreements and representations and upon the terms and subject to the conditions set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE I

DEFINITIONS

§1. Definitions.

§1.1 Defined Terms. When used in this Agreement, the following terms shall have the respective meanings specified therefor below.

9705162.1

"**Ancillary Agreements**" shall mean the Bill of Sale, the Assignment and Assumption Agreement, and all other agreements, instruments or documents executed and delivered in connection herewith or therewith.

"**Affiliate**" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with, such Person; provided, that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise; and provided, further, that an Affiliate of any Person shall also include (i) any Person that directly or indirectly owns more than five percent (5%) of any class of capital stock or other equity interest of such Person, (ii) any officer, director, trustee or beneficiary of such Person, (iii) any spouse, parent, sibling or descendant of any Person described in clauses (i) or (ii) above, and (iv) any trust for the benefit of any Person described in clauses (i) through (iii) above or for any spouse, issue or lineal descendant of any Person described in clauses (i) through (iii) above.

"**Books and Records**" shall mean all books, records, manuals and other materials (in any form or medium and wherever held), including all records and materials held by Seller, advertising matter, catalogues, price lists, correspondence, mailing lists, lists of current and former customers and suppliers (and all data related thereto), distribution and other mailing lists, photographs, production data, computer data, all studies and research, sales and promotional materials and records, purchasing materials and records, personnel records, manufacturing and quality control records and procedures, facilities and/or equipment plans and specifications, blueprints, research and development files, data and laboratory books, Intellectual Property disclosures and tangible embodiments of Intellectual Property, media materials and plates, accounting records, sales order files and litigation files related to the Business or the Purchased Assets.

"**Business Day**" shall mean any day, other than a Saturday, Sunday or a day on which banks located in New York, New York shall be authorized or required by law to close.

"**Claim**" shall mean any claim, counterclaim, lawsuit, demand, suit, cause of action, inquiry made, hearing, investigation, notice of violation, litigation, proceeding, arbitration or other dispute, whether civil, criminal, administrative or otherwise.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and the rulings issued thereunder. Section references to the Code are to the Code as in effect at the date of this Agreement.

"**Declaratory Judgment Action**" shall mean that certain adversary proceeding styled *KyotoCooling North America LLC. v. Data Cooling Technologies, Inc.*, Adversary Proceeding No. 17-ap-5072 in the United States Bankruptcy Court for the Northern District of Ohio at Akron.

9705162.1

"**Employee Benefit Plan**" shall mean any employee benefit plan (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended) or other health, welfare or fringe benefit plan maintained or contributed to or required to be contributed to by Seller or any of its Affiliates, with respect to any present or former employee of the Business.

"**Environmental Laws**" means any federal, state, or local statute, law, ordinance, code, or order; and any regulation promulgated thereunder, which regulates or controls (i) pollution, contamination, or the condition of groundwater, surface water, soil, sediment or air, or (ii) a spill, leak, emission, discharge, release or disposal into groundwater, surface water, soil, sediment or air, including without limitation the federal Comprehensive, Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 et seq., as amended; the Federal Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 et seq., as amended; the Hazardous Materials Transportation Act (HMTA), 49 U.S.C. § 1801 et seq., as amended; the Toxic Substances Control Act (TSCA), 15 U.S.C. § 2601 et seq., as amended; the Clean Air Act (CAA), 42 U.S.C. § 7401 et seq., as amended; the Clean Water Act (CWA), 33 U.S.C. § 1251 et seq., as amended; the Safe Drinking Water Act (SDWA), 42 U.S.C. § 300f et seq., as amended; the Emergency Planning and Community Right to Know Act (EPCRA), 42 U.S.C. § 11001 et seq., as amended; the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. § 136 et seq., as amended; the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., as amended; any similar state or local statutes or ordinances, and the regulations promulgated thereunder.

"**Governmental or Regulatory Authority**" shall mean any instrumentality, subdivision, court, administrative agency, commission, official or other authority of the United States or any other country, or any state, province, prefect, municipality, locality or other government or political subdivision thereof, or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority.

"**Insider**" shall have the meaning set forth in section 101(31) of the Bankruptcy Code.

"**Intellectual Property**" shall mean (i) all inventions, whether patentable or unpatentable (and whether or not reduced to practice), all improvements thereto, and all patents including all patents and patent disclosures and applications, and registered design and registered design applications, together with all reissuance, continuations, continuations-in-part, revisions, extensions and reexaminations thereof, (ii) all trademarks, including registered or unregistered trademarks, registered or unregistered servicemarks, and all translations, adaptations, deviations, combinations, applications, registrations and renewals in connection with any registered or unregistered trademark or servicemark, and all trade names, trade dress and logos, (iii) all copyrights, meaning all registered copyrights, copyright applications, copyrightable works, and unregistered copyrights, and all applications, registrations, and renewals in connection therewith, (iv) all mask works and all applications, registrations, and renewals in connection therewith, (v) all Confidential Information, (vi) all computer software and software licenses (including data and related documentation), phone numbers, websites and domain names, (vii) all other similar proprietary rights, and (viii) all copies and tangible embodiments of the foregoing, in whatever

-4-

9705162.1

form or medium, owned or held by Seller or which have been or are used primarily in the operation of the Business, including without limitation those set forth on Schedule 2.1(g).

"**KCNA Claim**" shall mean KCNA's the claim for unpaid royalties payable by Seller to Purchaser in the amount of $1,700,000.

"**Knowledge**" shall mean to the actual knowledge of the officers and senior management of Seller or Purchaser, as applicable.

"**Liability**" shall mean any debt, liability, obligation, Claim, Lien, commitment, demand or expense of any nature or kind, whether known or unknown, asserted or unasserted, accrued or unaccrued, absolute, contingent or otherwise and whether due or to become due.

"**Liens**" shall mean liens, security interests, options, rights of first refusal, Claims, easements, mortgages, charges, indentures, deeds of trust, rights of way, restrictions on the use of real property, encroachments, licenses to third parties, leases to third parties, security agreements, or any other encumbrances and other restrictions or limitations on use of real or personal property or irregularities in title thereto.

"**Material Adverse Change**" shall mean, (i) when used with respect to the Business, any materially adverse change in or effect on the business, assets, Liabilities, results of operation, condition (financial or otherwise) (but only to the extent that such material adverse change or effect would continue to affect the Purchased Assets or Purchaser's operation of the Purchased Assets following the Closing); provided, however, that, except as expressly provided below, the filing, prosecution, pendency and disposition of the Chapter 11 Case and the consequences thereof shall not constitute any such a material adverse change or effect, and/or (ii) when used with respect to Purchaser or Seller, as the case may be, any materially adverse change in or effect on (including any material delay) the ability of Purchaser or Seller, as the case may be, to perform their respective obligations hereunder; provided, however, that the operations or sale of the Thermotech Business shall not be a Material Adverse Change.

"**Net Proceeds**" shall mean, in respect of the Nortek Action, the amount recovered post-Closing in the Nortek Action after first reimbursing expenses, including attorneys' fees, that have been paid in the Nortek Action.

"**Nortek Action**" shall mean that certain civil action styled *KyotoCooling North America LLC, et al. v. Nortek Air Solutions, LLC, et al.*, Case No. 3:16-cv-00381-N in the United States District Court for the Northern District of Texas.

"**Order**" shall mean any judgment, order, injunction, decree, writ, permit or license of any Governmental or Regulatory Authority or any arbitrator.

"**Permits**" shall mean all right, title and interest in and to Seller's permits, licenses, filings, authorizations, approvals, and indicia of authority as issued by any Governmental or Regulatory Authority (and all pending applications for approval or renewal of permits to own, construct, operate or maintain any of the Purchased Assets), necessary to conduct the Business including without limitation those permits set forth on Schedule 2.1(e).

-5-

"**Permitted Liens**" shall mean (i) Assumed Liabilities and Liens in respect of Assumed Liabilities; (ii) Liens that cannot be released or cured under the Bankruptcy Code pursuant to a sale of assets under Section 363 or 365 of the Bankruptcy Code and that either (A) individually or in the aggregate would not involve material costs to correct or remove or (B) do not individually or in the aggregate materially impair the use or operation of any material Purchased Asset; (iii) Liens that are caused by Purchaser; and (iv) Liens that will not survive the Closing.

"**Person**" shall mean and include an individual, a partnership, a joint venture, a corporation, a limited liability company, a limited liability partnership, a trust, an incorporated organization and a Governmental or Regulatory Authority.

"**Premises**" shall mean the manufacturing facilities, offices, lots and any other space used by the Business and located at 1777 Miller Parkway, Streetsboro, Ohio 44241

"**Rule 2004 Motion**" shall mean that certain motion filed by Seller in the Bankruptcy Case under Rule 2004 [Docket No. 107].

"**Subsidiary**" shall mean, with respect to any Person, (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is owned by such Person directly or indirectly through one or more Subsidiaries of such Person and (ii) any partnership, association, joint venture or other entity in which such Person directly or indirectly through one or more Subsidiaries of such Person has more than a 50% equity interest.

"**Thermotech Assets**" shall mean all of the assets of Seller associated solely with the Thermotech Business, including the accounts receivable generated solely from the Thermotech Business and the assets subject to the sale of the Thermotech Business as described in the motion of Seller filed in Seller's bankruptcy case at Docket No. 156.

"**Thermotech Business**" shall mean the business that is a division of Seller operated in Tampa, Florida.

§1.2    Additional Defined Terms. In addition to the terms defined in Section 1.1, the following terms shall have the respective meanings assigned thereto in the sections indicated below.

| Defined Term | Page |
|---|---|
| Agreement | 2 |
| Approval Order | 13 |
| Assignment and Assumption Agreement | 22 |
| Assumed Contracts | 8 |
| Assumed Liabilities | 10 |

-6-

9705162.1

| | |
|---|---|
| Bankruptcy Code | 2 |
| Bankruptcy Court | 2 |
| Bankruptcy Petition | 2 |
| Bill of Sale | 21 |
| Business | 2 |
| Chapter 11 Case | 2 |
| Closing | 12 |
| Closing Date | 12 |
| Confidentiality Agreement | 15 |
| Excluded Contracts | 9 |
| Non-Conforming Approval Order | 23 |
| Outside Approval Order Date | 23 |
| Purchase Price | 12 |
| Purchased Assets | 8 |
| Purchaser | 2 |
| Retained Assets | 9 |
| Retained Liabilities | 11 |
| Seller | 2 |

§1.3    Construction.  In this Agreement, unless the context otherwise requires:

(a)    any reference in this Agreement to "writing" or comparable expressions includes a reference to facsimile transmission or comparable means of communication;

(b)    words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

(c)    references to Articles, Sections, Exhibits, Schedules and Recitals are references to articles, sections, exhibits, schedules and recitals of this Agreement;

(d)    reference to "day" or "days" are to calendar days;

(e)    this "Agreement" or any other agreement or document shall be construed as a reference to this Agreement or, as the case may be, such other agreement or document as the same may have been, or may from time to time be, amended, varied, novated or supplemented; and

(f)    "include," "includes" and "including" are deemed to be followed by "without limitation," whether or not they are in fact followed by such words or words of similar import.

§1.4    Schedules and Exhibits.  The Schedules and Exhibits to this Agreement are incorporated into and form an integral part of this Agreement.  If an Exhibit is a form of agreement, such agreement, when executed and delivered by the parties thereto, shall constitute a document independent of this Agreement.

9705162.1

# ARTICLE II

## PURCHASE AND SALE OF ASSETS

§2. Purchase and Sale of Assets.

§2.1 <u>Sale of Assets</u>. Upon the terms and subject to the conditions of this Agreement, Purchaser agrees to purchase, assume and accept from Seller, and Seller agrees to sell, convey, transfer, assign and deliver to Purchaser, as a good faith purchaser for value within the meaning of Section 363(m) of the Bankruptcy Code, on the Closing Date, all of Seller's right, title and interest in and to all assets of any type or nature, whether tangible or intangible, or located on or off the Premises related to the Business, other than Retained Assets (the "**Purchased Assets**"), free and clear of all Liens, Claims and Liabilities of any nature whatsoever, other than Permitted Liens, and all as contemplated by Section 363(f) of the Bankruptcy Code, including, to the extent the same are related to the Business and not listed as Retained Assets:

(a) all fixed and tangible personal property, including all machinery, equipment, office equipment, furniture, furnishings, automobiles, trucks, vehicles, tools, dies, molds and parts and similar property, including the fixed and tangible personal property set forth on <u>Schedule 2.1(a)</u>;

(b) all raw materials (whether previously purchased and in transit to Seller or already in possession of Seller), work-in-process, finished goods, supplies and inventory;

(c) those purchase orders and contracts set forth on <u>Schedule 2.1(c)</u>, all deposits and rights related to such deposits, and all rights to receive payment for products sold or services rendered thereunder, all rights to receive goods and services and to leasehold interests pursuant thereto, and all rights to assert Claims and take other rightful actions in respect of breaches, defaults and other violations thereof (collectively, the "**Assumed Contracts**"); <u>provided</u> <u>however</u>, Purchaser shall have the right, but not the obligation, to add to or subtract from those contracts set forth on <u>Schedule 2.1(c)</u>; In order to adjust the "Assumed Contracts" listed on <u>Schedule 2.1(c)</u>, Purchaser must deliver a revised <u>Schedule 2.1(c)</u> to Seller on or before three (3) days prior to the Closing Date. Subject to Section 2.3(e)(iii), such revised schedule shall be deemed the final list of Assumed Contracts, unless the Bankruptcy Court does not approve the assumption and assignment of a contract, in which case it shall not be an Assumed Contract.

(d) all accounts receivable and notes receivable whether or not associated with an Assumed Contract;

(e) all rights of Seller under any commitments or Permits;

(f) all rights relating to any prepaid expenses;

(g) all Intellectual Property owned or licensed by Seller;

-8-

9705162.1

(h)     the Books and Records;

(i)     all rights to Claims of any nature available to or being pursued by Seller, including with respect to the ownership, use, function or value of any Purchased Asset, whether arising by way of counterclaim or otherwise, including without limitation the Nortek Action;

(j)     those guarantees, warranties, indemnities and similar rights in favor of Seller with respect to any Purchased Asset, to the extent conveyable; and

(k)     all other assets of Seller related to the Business (whether owned or leased, real or personal, or tangible or intangible), other than the Retained Assets.

§2.2    Retained Assets. Notwithstanding the foregoing and irrespective of any relationship to the Business, the Purchased Assets shall not include the following assets of Seller (the "**Retained Assets**"):

(a)     all cash on hand, security deposits held by third parties under contracts not constituting Assumed Contracts, and all cash in financial institutions, cash equivalents, and marketable securities and bonds;

(b)     the Thermotech Assets;

(c)     all claims for refunds and/or credits for income taxes or for prepaid income taxes;

(d)     all contracts other than the Assumed Contracts (collectively, the "**Excluded Contracts**");

(e)     Seller's rights under any or all of this Agreement, the Ancillary Agreements or any other agreement, instrument or document executed in connection herewith, and the Approval Order;

(f)     any Claims arising out of the Retained Assets, provided, however, for removal of any doubt the Nortek Action shall not be a Retained Asset;

(g)     insurance proceeds and Claims with respect to or arising in connection with (A) any Excluded Contract, or (B) any Retained Asset;

(h)     all preference or avoidance claims and actions of Seller, including, without limitation, any such preference and avoidance claims and actions arising under or brought pursuant to Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code, including without limitation related to the sale of Air Enterprises assets that occurred in or around May and June 2017, and any other claim, including without limitation for breach of fiduciary duty, related to the sale of Air Enterprises assets that occurred in or around May and June 2017, but excluding any such preference or avoidance claims against (i) Purchaser, or (ii) any counterparty to an Assumed Contract, which shall not be sold to Purchaser but shall be deemed released at the Closing;

-9-

(i)        any intracompany Claim or obligation from the Thermotech Business on Seller's books;

(j)        any deposit, prepayment or escrow made prior to the Petition Date to any utility or landlord in connection with any real property leased for the Tampa, Florida operation of the Thermotech Business;

(k)        any retainer, deposit, prepayment or escrow held by any estate professional as of the Petition Date or approved and payable pursuant to any order of the Bankruptcy Court authorizing the use of cash collateral;

(l)        any Employee Benefit Plan and any assets thereof;

(m)        any Claim, obligation from, or right to recover against any Affiliate, Insider or former Insider of the Seller; and

(n)        all equity interests in Arborwear LLC shall be a Retained Asset.

§2.3    <u>Assumption of Liabilities</u>.  At the Closing, Purchaser shall assume and be liable for, and shall pay, perform or, as the case may be, discharge when due, only those Liabilities of Seller (collectively, the "**Assumed Liabilities**") set forth below:

(a)        all Liabilities arising out of, or in respect of, the Purchased Assets arising or incurred after the Closing;

(b)        any purchase orders that are described on <u>Schedule 2.3(b)</u>;

(c)        all obligations incurred after the Closing related to the Nortek Action;

(d)        all obligations under the Assumed Contracts to the extent arising, occurring or to be performed under the Assumed Contract after the Closing Date; and

(e)        those accrued expenses of Seller arising out of, or in respect of, the Business in the ordinary course that are specifically described on <u>Schedule 2.1(c)</u> (such accrued expenses, the "**Accrued Expense Cure Amount**") which expenses must be paid in order to allow the assumption and assignment of the Assumed Contracts under Section 365 of the Bankruptcy Code.  The Accrued Expense Cure Amount on <u>Schedule 2.1(c)</u> shall be calculated on a contract by contract basis as of the date hereof.  The Accrued Expense Cure Amount may be adjusted as follows:

(i)        To the extent that Schedule 2.1(c) is revised pursuant to Section 2.1(c), the proposed Accrued Expense Cure Amount shall be calculated on a contract by contract basis as of the Closing Date for all the Assumed Contracts on the revised schedule.

(ii)        To the extent that the proposed cure amount for any proposed Assumed Contract is greater at the Closing Date than the amount listed on the

-10-

initial Schedule 2.1(c), the difference shall be paid by Purchaser (as part of the cure requirement under §365 of the Bankruptcy Code); provided, however, Purchaser may in such event elect to remove such Assumed Contract from Schedule 2.1(c).

(iii)     To the extent that any proposed Assumed Contract is not originally included on Schedule 2.1(c) but is added to the revised Schedule 2.1(c) prior to the Closing Date, Seller shall provide a calculation of the proposed cure amount as of the date such proposed Assumed Contract is added to Schedule 2.1(c) of this Agreement and as of the Closing Date.  To the extent that the proposed cure amount for any such proposed Assumed Contract is greater at the Closing Date than the amount set forth on Schedule 2.1(c) as amended, the difference shall be paid by Purchaser (as part of the cure requirement under §365 of the Bankruptcy Code); provided, however, Purchaser may in such event elect to remove such Assumed Contract from Schedule 2.1(c).

(iv)     To the extent any executory lease or contract is removed from Schedule 2.1(c) as permitted by Section 2.1(c), Purchaser shall have no payment obligations related to such lease or contract and no amount related to such agreement shall be included in the Accrued Expense Cure Amount.

Notwithstanding anything herein, Seller shall have no obligation to pay any cure amounts associated with Assumed Contracts not funded by Purchaser, it being the intent of the parties that Purchaser be able to determine which contracts to have assumed and assigned after a determination of cure amounts.

Assumed Liabilities shall not, in any event, include any Retained Liabilities.

§2.4     Retention of Liabilities.

(a)     Notwithstanding the foregoing, Seller shall retain, and shall be solely and exclusively liable for (subject to its defenses thereto), all Liabilities of Seller other than the Assumed Liabilities (the "**Retained Liabilities**"), including, but not limited to:

(i)     any Liability under or with respect to an Employee Benefit Plan or arising in connection with the employment and pay practices of Seller or any of its Affiliates, including any obligations, costs or liabilities relating to compliance with the requirements of the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) and including any liability that has been asserted or could be asserted under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. ("WARN Act"), including in *Albright v. Data Cooling Technologies LLC*, Adversary Proceeding No. 17-ap-05065 in the United States Bankruptcy Court for the Northern District of Ohio at Akron;

(ii)     any Liability associated with the Retained Assets;

(iii)     any taxes imposed on Seller or the income, assets or operations of Seller or the Purchased Assets for all periods prior to the Closing;

-11-

9705162.1

(iv)    any product liability Claim arising out of or relating to products or components of products designed, sold or manufactured, in whole or in part, by Seller prior to the Closing Date;

(v)    any costs or expenses incurred by Seller incident to its negotiation and preparation of this Agreement and the Ancillary Agreements, and its performance and compliance with the agreements and conditions contained herein; and

(vi)    any Liability under any Environmental Law arising from facts, circumstances and conditions existing as of the Closing Date.

(b)    Purchaser shall not assume, or otherwise be responsible for, any Liabilities of any Affiliates of Seller.

(c)    Nothing herein shall be deemed an admission to any Liability by, or create any new Liability against, Seller (other than its obligations hereunder).

§2.5   <u>Purchase Price and Deposit</u>. Purchaser shall provide Seller a Deposit of $80,000 no later than November 17, 2017, provided that no later than November 15, 2017 or such other date(s) Purchaser requests prior to November 17, 2017, Seller shall provide diligence reasonably requested by Purchaser, including without limitation a tour of the Premises and access to all fixed assets and inventory related to the Business. In full consideration for the sale by Seller of the Purchased Assets, Purchaser shall, (i) on the Closing Date, (A) pay to Seller an aggregate of $1,300,000, in immediately available funds, subject to a credit in the amount of the Deposit, and (B) assume the Assumed Liabilities, (ii) timely pay the Accrued Expense Cure Amount such that any Assumed Contracts pursuant to which such Accrued Expense Cure Amounts are payable may be assigned to Purchaser in accordance with the provisions of Section 365 of the Bankruptcy Code, and (iii) within five (5) business days of receipt of any funds of the Nortek Action, disburse to (A) first to Purchaser, until paid in full, to reimburse all actual fees, costs and expenses advanced by Purchaser, (B) second to Seller, until paid in full, to reimburse all actual fees, costs and expenses advanced by Seller, and (C) after such actual costs and expenses have been reimbursed in full, fifty percent (50%) of the Net Proceeds of the Nortek Action (collectively, the "**Purchase Price**").

§2.6   <u>Closing</u>. The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place as soon as practicable after the last of the conditions set forth in Articles VI and VII hereof is satisfied or waived, but in no event later than the earlier of (i) the fifth (5th) Business Day after the entry of the Approval Order, and (ii) or such other time and date (not later than November 30, 2017) as the parties hereto shall agree. Such date is herein referred to as the "**Closing Date**."

ARTICLE III

<u>REPRESENTATIONS OF SELLER</u>

§3.   <u>Representations of Seller</u>. Seller represents, warrants and agrees as follows:

-12-

9705162.1

§3.1 <u>Authority and Enforceability</u>. Seller has the corporate power and authority to execute and deliver this Agreement and the other instruments and agreements to be executed and delivered by Seller as contemplated hereby. Subject to approval by the Bankruptcy Court, Seller has the corporate power and authority to consummate the transactions contemplated hereby and by the Ancillary Agreements, including the sale, assignment, transfer and conveyance of the Purchased Assets pursuant to this Agreement. The execution, delivery and performance of this Agreement, and all other instruments and agreements to be executed and delivered by Seller as contemplated hereby, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by Seller's Board of Directors and no other corporate action on the part of Seller is necessary to authorize the execution, delivery and performance of this Agreement and such other instruments and agreements by Seller, and the consummation of the transactions contemplated hereby and thereby. This Agreement and all other instruments and agreements to be executed and delivered by Seller as contemplated hereby, when delivered in accordance with the terms hereof, assuming the due execution and delivery of this Agreement and each such other document by the other parties hereto and thereto, have been, or, as the case may be, shall have been, duly executed and delivered by Seller and are or, as the case may be, will be valid and binding obligations of Seller, enforceable in accordance with their terms upon the entry by the Bankruptcy Court of an order approving this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby, which order shall not have been stayed pending appeal, in a form and substance reasonably acceptable to Purchaser (the "**Approval Order**"). All of the tangible personal property used in the Business is, under the present circumstances (recognizing that Seller ceased normal business operations in August 2017), in good operating condition and repair, ordinary wear and tear excepted, and is adequate and suitable for the purposes for which it is presently being used. The Purchased Assets constitute all the properties, assets and rights sufficient to conduct the Business in all material respects as conducted as of the date of this Agreement.

§3.2 <u>Existence and Good Standing of Seller</u>. Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Seller has all requisite corporate power and authority to own its property and to conduct the Business as it is now being conducted. Seller is duly qualified to do business and is in good standing in each jurisdiction in which the character or location of the properties owned, leased or operated by Seller or the nature of the Business makes such qualification necessary.

§3.3 <u>Title to Assets</u>. Seller has good title to or, in the case of leased assets, a valid leasehold interest in the Purchased Assets. Upon consummation of the transaction contemplated hereby, Purchaser will have acquired good and marketable title in and to, or a valid leasehold interest in, each of the Purchased Assets, free and clear of all Liens, except for Permitted Liens, to the maximum extent permitted by the Bankruptcy Code and the Approval Order.

§3.4 <u>Litigation</u>. Except as set forth in <u>Schedule 3.4</u> and other than the Chapter 11 Case and the matters that may arise therein, as of the date hereof, there are no Claims pending or, to the Knowledge of Seller, threatened against or affecting the operations or conduct of the Business or the use of the properties of the Business.

-13-

# ARTICLE IV

## REPRESENTATIONS OF PURCHASER

§4. <u>Representations of Purchaser</u>. Purchaser represents, warrants and agrees as follows:

§4.1 <u>Existence and Good Standing of Purchaser; Power and Authority</u>. Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Purchaser has the corporate power and authority to execute and deliver this Agreement and the other instruments and agreements to be executed and delivered by it as contemplated hereby. Purchaser has the corporate power and authority to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement, and all other instruments and agreements to be executed and delivered by Purchaser as contemplated hereby, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by Purchaser's Board of Directors and no other corporate actions on the part of Purchaser are necessary to authorize the execution, delivery and performance of this Agreement and such other instruments and agreements by it and the consummation of the transactions contemplated hereby and thereby. This Agreement and all other instruments and agreements to be executed and delivered by Purchaser as contemplated hereby, when delivered in accordance with the terms hereof, assuming the due execution and delivery of this Agreement and each such other document by the other parties hereto and thereto, shall have been duly executed and delivered by Purchaser and shall be valid and binding obligations of Purchaser, enforceable against it in accordance with their terms, except to the extent that their enforceability may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and to general equitable principles.

§4.2 <u>Litigation</u>. There are no Claims pending, or, to Purchaser's Knowledge, threatened against or affecting Purchaser, which challenge or seek to prevent or impair Purchaser's ability to execute or perform its obligations under this Agreement.

# ARTICLE V

## COVENANTS, SETTLEMENT AND RELEASES

§5. <u>Covenants</u>.

§5.1 <u>Review of the Business</u>.

(a) Purchaser may, prior to the Closing Date, directly or through its representatives and at its sole cost and expense, review the properties, Books and Records of Seller and its financial and legal condition to the extent they reasonably believe necessary or advisable to familiarize themselves with such properties and other matters. Seller shall permit Purchaser and its representatives to have, after the date of execution of this Agreement, full access to the Premises and to all the Books and Records (including tax returns filed and tax returns in preparation to be filed) and Seller shall cause its officers, employees, counsel, accountants, consultants and other representatives to furnish

-14-

9705162.1

Purchaser with such financial and operating data and other information with respect to the business and properties of the Business as Purchaser shall from time to time reasonably request; provided, that such investigation and assistance shall not unreasonably disrupt the operations of the Business and that there shall be no obligation to provide: (i) attorney/client privileged communications; (ii) attorney work product; or (iii) any other documents associated with prior disputes between Purchaser and Seller. In addition, Seller shall use commercially reasonable efforts to facilitate discussions between Purchaser and Seller's suppliers and vendors prior to Closing, which discussions shall be in a form and manner reasonably acceptable to Purchaser and Seller and conducted at Purchaser's sole cost and expense.

(b)     Any information regarding Seller obtained by Purchaser pursuant to paragraph (a) above shall be subject to that certain Confidentiality Agreement, dated July 18, 2017, by and between Seller and Purchaser, the terms of which are incorporated herein by reference (as amended from time to time, the "**Confidentiality Agreement**"). Effective upon, and only upon, the Closing, Purchaser's obligations under the Confidentiality Agreement shall terminate.

§5.2     Public Announcements.  Seller shall not, nor shall any of its Affiliates, without the approval of Purchaser, issue any press releases or otherwise make any public statements with respect to the transactions contemplated by this Agreement, except as may be required by applicable law; provided, that in the event disclosure is required by law, Seller shall use its best efforts to obtain the approval of Purchaser prior to issuing such press release or making such public disclosure.  The foregoing provision shall not apply to statements made or actions taken in connection with Seller's obligations in the Chapter 11 Case, including, without limitation, attaching a copy of this Agreement to the motion filed with the Bankruptcy Court seeking entry of the Approval Order, communication with parties that have filed an appearance in the Chapter 11 Case or other actions taken in furtherance of the events contemplated by the Approval Order.  Seller agrees that Purchaser shall issue a public statement with respect to the transactions contemplated by this Agreement, which public statement shall be reasonably acceptable to Seller and shall enable Purchaser to comply with its obligations under International Financial Reporting Standards (IFRS) accounting rules.

§5.3     Notification of Certain Matters.  Seller shall give prompt notice to Purchaser of any of the following which occurs, or of which it becomes aware, to the best of its Knowledge, following the date hereof:  (i) any notice of, or other communication relating to, a default or event that, with notice or lapse of time or both, would become a default under any Assumed Contract; (ii) the occurrence or existence of any fact, circumstance or event which would reasonably be expected to result in (A) any representation or warranty made by Seller in this Agreement or in any Schedule, Exhibit or certificate or delivered herewith, to be untrue or inaccurate or (B) the failure of any condition precedent to Purchaser's obligations; and (iii) any notice or other communication from any third party alleging that the consent of such third party is or may be required in connection with the transactions contemplated by this Agreement.  Such notice shall not affect the ability of Purchaser to terminate this Agreement and the ability of Purchaser to terminate this Agreement shall be governed by Article VIII.

9705162.1

§5.4 <u>Interim Operations by Seller</u>. Except as agreed to in writing by Purchaser or as may be required by the Bankruptcy Court, between the date of execution of this Agreement and the Closing, Seller shall, in the context of its Chapter 11 Case, conduct and operate the Business (including its working capital and cash management practices) only according to its ordinary course of Business consistent with past practice during the pendency of the Chapter 11 Case, and use its commercially reasonable efforts to (i) preserve and keep intact the Business, (ii) keep available the services of its current employees, including making all salary and benefit payments, (iii) preserve its relationships with customers, suppliers and others having business dealings with Seller, (iv) maintain the Purchased Assets in a state of repair and condition consistent with the normal conduct of the Business during the pendency of the Chapter 11 Case and not encumber or permit the incurrence of any Lien (other than Permitted Liens) on the Purchased Assets, and (v) conduct itself and the Business in accordance with the requirements of applicable laws, including the Bankruptcy Code and all orders of the Bankruptcy Court. Notwithstanding the immediately preceding sentence, prior to or on the Closing Date, except as may be first approved in writing by Purchaser, Seller shall refrain from the following:

(a) increasing the compensation payable (including, but not limited to, wages, salaries, bonuses or any other remuneration) or to become payable to any officer, employee or agent other than in the ordinary course of business;

(b) modifying, amending, renewing, extending or terminating any Assumed Contract or entering into or becoming subject to any contract of a type included in the Assumed Contracts or outside the ordinary course of business;

(c) selling, transferring, leasing, licensing, granting, waiving or otherwise disposing of any Purchased Assets or rights therein except for sales of inventory in the ordinary course of Business consistent with past practice;

(d) splitting, combining, subdividing or reclassifying any shares of its capital stock or other equity interests or declare, set aside or pay any dividend or other distribution (whether in cash, stock or property or any combination thereof) in respect of its capital stock;

(e) making any capital expenditure or commitment therefor or otherwise acquiring any assets or properties, other than inventory in the ordinary course of Business consistent with practice;

(f) writing-off as uncollectible any notes or accounts receivable, except write-offs in the ordinary course of Business consistent with past practice charged to applicable reserves;

(g) canceling or waiving any Claims or rights of substantial value relating to the Business; provided that Purchaser shall confer with Seller regarding any such proposed cancellation or waiver of Claims or rights not relating to the Business during the period prior to the Closing Date;

(h) making any change in any method of accounting or auditing practice;

-16-

(i)    taking any other actions which, individually or in the aggregate, would have or would likely cause a Material Adverse Change with respect to the Business; or

(j)    entering into any contract or letter of intent with respect to (whether or not binding), or otherwise committing or agreeing, whether or not in writing, to do any of the foregoing.

§5.5    Additional Matters.

(a)    Seller shall use its commercially reasonable efforts to consummate the transactions contemplated by this Agreement and the Ancillary Agreements including by seeking, through an appropriate motion or motions, entry of an appropriate order or orders of the Bankruptcy Court approving this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby; provided, that such motions and orders shall be in form and substance reasonably satisfactory to the Purchaser.

(b)    Within one (1) Business Day following the date hereof, Seller shall file with the Bankruptcy Court (and arrange for the provision of service and notice to its creditors, equityholders and parties in interest as required by Purchaser with respect thereto) a motion seeking approval of the transactions contemplated by this Agreement and entry of an order from the Bankruptcy Court providing the relief specified in Subsection (c) below, and thereafter, Seller shall use its commercially reasonable efforts to obtain such orders in a timely fashion.

(c)    An order entered at Seller's request will provide that:

(i)    Seller agrees to pay to Purchaser an expense reimbursement of actual and reasonable out of pocket expenses of up to one hundred thousand dollars ($100,000) (the "**Expense Reimbursement**") promptly upon the conveyance of all or a substantial portion of the Purchased Assets to a Person other than Purchaser either through a sale pursuant to Section 363 of the Bankruptcy Code or in any other manner (an "**Alternate Transaction**"); provided, that at the earlier of the date that Seller abandons the Bankruptcy Code Section 363 sale process contemplated by this Agreement, or the conclusion of the Bankruptcy Code Section 363 sale hearing contemplated by this Agreement, Purchaser is ready, willing and able to consummate the transactions contemplated by this Agreement and the Ancillary Agreements subject to satisfaction of all of the conditions to Purchaser's obligations set forth in Article VI (it being understood that Purchaser shall be entitled to a rebuttable presumption that they were ready, willing and able to consummate the transactions contemplated by this Agreement and the Ancillary Agreements). Seller shall have no obligation to pay the Expense Reimbursement if Purchaser terminates this Agreement prior to the Closing.

(ii)    The Expense Reimbursement (i) shall be paid by wire transfer to Purchaser at the closing of any Alternate Transaction and (ii) shall be payable from the proceeds of any Alternate Transaction.

(iii)    The Expense Reimbursement shall be accorded administrative expense priority status.

9705162.1

(iv)    In the event the Alternate Transaction includes a "credit bid" for all or a portion of such alternate purchaser's purchase price, the secured creditor making such "credit bid" must pay the Expense Reimbursement in cash at closing to Purchaser.

§5.6    <u>No Assumption</u>.  Purchaser does not assume or agree to pay, or indemnify Seller, or any other Person against any Liability, obligation, or expense of Seller relating to the Purchased Assets in any way except, and only to the extent, expressly provided for herein or in the Ancillary Documents (including the Assumed Liabilities). Moreover and notwithstanding any other provision of this Agreement, Purchaser does not agree to assume any obligation of Seller, except with respect to the Assumed Liabilities.

§5.7    <u>Seller's Employees</u>.

(a)    Except as otherwise provided herein, on the Closing Date, Seller will terminate Seller's employees who are associated solely with the Business.  Seller agrees that, except as otherwise provided herein, Purchaser shall assume no Liability with respect to any of Seller's employees and shall have no obligation to hire any of Seller's employees.

(b)    Purchaser shall have no obligation to make severance payments to any employee of Seller by virtue of said employee's termination of employment with or by Seller prior to or as of the Closing.

(c)    Purchaser shall not have any responsibility or Liability under (i) any Employee Benefit Plan, (ii) any collective bargaining agreement with any representative of any employee, or (iii) any individual written agreement between Seller and any of its employees setting forth specific terms of employment duration or compensation or benefits, including, without limitation, any termination agreement, or any agreement for parachute payments.

(d)    Nothing expressed or implied in this Agreement shall confer upon any of Seller's employees or any beneficiary, dependent, legal representative or collective bargaining agent of such employees any right or remedy of any nature or kind whatsoever under or by reason of this Agreement, including without limitation any right to employment or to continued employment for any specified period, at any specified location or under any specified job category, or any working condition, rule or practice.

(e)    Seller shall be responsible for any notification that may be required under the Worker Adjustment and Retraining Notification Act of 1988 or such other federal, state or local laws

(f)    No later than the Closing, Seller shall release any employee from any non-compete obligation, any confidentiality obligation, any non-disclosure obligation or any non-solicitation obligation (other than with respect to attorney/client privileged or attorney work product matters from prior to the Closing).

§5.8    <u>Further Assurances.</u>  Following the Closing, Seller and Purchaser will use reasonable efforts, upon request of the other party, to do, execute, acknowledge, and deliver, or

-18-

cause to be done, executed, acknowledged, and delivered, all such further acts, assignments, transfers, conveyances, powers of attorney, and assurances necessary to consummate the transactions contemplated by this Agreement. Seller will, at Purchaser's request, use reasonable efforts to obtain all authorizations or consents that may reasonably be required for the conveyance, transfer, assignment, and delivery to Purchaser, or to its successors and assigns, or for aiding and assisting in collecting or reducing to possession, any or all of the Purchased Assets to be transferred hereunder, and all costs and expenses incurred in connection with this Section 5.9 shall be paid by Purchaser. Seller authorizes Purchaser to record the evidences of transfer of the Purchased Assets to Purchaser under this Agreement.

§5.9   Cooperation in Tax Proceedings. To the extent possible, the parties will provide each other with such assistance as may reasonably be requested by any of them in connection with the completion and filing of any form, preparation of any tax return, any audit or other examination by any taxing authority, or any judicial or administrative proceedings relating to Liability for taxes relating to the Purchased Assets or the transactions contemplated by this Agreement. Each party will retain and provide the others with any records or information that may be relevant to such return, audit, examination, proceedings, or determination. Such assistance shall include making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder and shall include providing copies of any relevant tax returns and supporting work schedules. At the Closing Seller and Purchaser shall compete and execute IRS Form 8594.

§5.10  Cooperation in the Nortek Action. To the extent possible, the parties will provide each other with such assistance as may reasonably be requested by Purchaser in connection with the Nortek Action, subject to Purchaser's obligation hereunder to pay for obligations incurred post-Closing under Section 2.3(c) hereof. Each party will retain and provide the other with any records or information that may be relevant to the Nortek Action. Such assistance shall include making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

§5.11  Settlement and Mutual Releases.

(a)     Waiver of KCNA Claim.   On the terms and subject to the conditions of this Agreement, Purchaser shall be deemed to waive the KCNA Claim in the Bankruptcy Case.

(b)     Litigation Stay. Any and all litigation between Purchaser and Seller, including without limitation in the Declaratory Judgment Action and with respect to the Rule 2004 Motion, including without limitation any and all pending deadlines and any and all related discovery, shall be stayed pending the entry of the Approval Order. Purchaser and Seller shall jointly seek all appropriate orders from the Bankruptcy Court in order to effectuate such stays.

(c)     Dismissals. Upon entry of the Approval Order by the Bankruptcy Court and the expiration of any applicable appeal periods, Purchaser and Seller to take any and all actions necessary to dismiss any and all litigation by and between them,

-19-

including without limitation the Declaratory Judgment Action and the Rule 2004 Motion, with prejudice, with each of the Purchaser and Seller to bear its own costs.

(d) _Releases_. The following releases shall be effective upon the fifteenth (15th) day after the entry Approval Order:

(i) DCT Release. Seller (sometimes hereinafter, "DCT"), for itself, and for each of its past, present and future officers, directors, members, managers, employees, owners, affiliated parent or subsidiary entities, spouses, beneficiaries, heirs, representatives, partners, predecessors, successors, grantees, transferees, trusts, agents, employees, estates, attorneys, insurers and assigns, (hereinafter, collectively, the "DCT Releasors"), hereby fully and irrevocably releases, acquits, and discharges Purchaser (sometimes hereinafter, "KCNA"), and each of its past, present and future officers, directors, members, managers, employees, owners, affiliated parent or subsidiary entities, spouses, beneficiaries, heirs, representatives, predecessors, successors, grantees, transferees, trusts, agents, employees, estates, attorneys, insurers and assigns acting in such capacities (hereinafter, the "KCNA Releasees") of and from any and all liabilities, claims, causes of action, counts, cross-claims, counterclaims, rights, duties, requests, suits, administrative proceedings, damages, costs (including costs of suit and attorneys' fees and expenses), or demands of whatever nature, character, type, or description, whether known or unknown, existing or potential, matured or unmatured, liquidated or unliquidated, direct or consequential, suspected or unsuspected, foreseen or unforeseen (collectively, the "DCT Claims"), which the DCT Releasors, and each of them, have or assert, or may hereafter have or assert, against any of the KCNA Releasees, by reason of any act or omission on the part of KCNA Releasees, save and except for the obligations that arise under this Agreement.

(ii) KCNA Release. KCNA, for itself, and for each of its past, present and future officers, directors, members, managers, employees, owners, affiliated parent or subsidiary entities, spouses, beneficiaries, heirs, representatives, predecessors, successors, grantees, transferees, trusts, agents, employees, estates, attorneys, insurers and assigns, (hereinafter, the "KCNA Releasors"), hereby fully and irrevocably release, acquit, and discharge DCT and each of its past, present and future officers, directors, members, managers, employees, owners, affiliated parent or subsidiary entities, spouses, beneficiaries, heirs, representatives, predecessors, successors, grantees, transferees, trusts, agents, employees, estates, attorneys, insurers and assigns acting in such capacities (hereinafter, the "DCT Releasees") of and from any and all liabilities, claims, causes of action, counts, cross-claims, counterclaims, rights, duties, requests, suits, administrative proceedings, damages, costs (including costs of suit and attorneys' fees and expenses), or demands of whatever nature, character, type, or description, whether known or unknown, existing or potential, matured or unmatured, liquidated or unliquidated, direct or consequential, suspected or unsuspected, foreseen or unforeseen (collectively, the "KCNA Claims"), which any of the KCNA Releasors have or assert, or may hereafter have or assert,

-20-

against any of the DCT Releasees, by reason of any act or omission on the part of the DCT Releasees, save and except for the obligations that arise under this Agreement; provided, however, nothing herein shall release any claim comprising a Purchased Asset.

(iii)     Other Release Provisions.  Each of the Releasors warrant and represent that none of the Claims herein released has been assigned, in whole or in part, to any person or entity.

## ARTICLE VI

## CONDITIONS TO PURCHASER'S OBLIGATIONS

§6.  Conditions to Purchaser's Obligations.  The purchase of the Purchased Assets by Purchaser on the Closing Date is conditioned on the satisfaction or waiver by Purchaser, at or prior to the Closing, of the following conditions:

§6.1     Truth of Representations and Warranties. The representations and warranties of Seller contained in this Agreement or in any Schedule, Exhibit or certificate delivered pursuant to this Agreement shall be true and correct in all material respects when made and as of the Closing, and Seller shall have delivered to Purchaser a certificate of an executive officer of Seller, dated the Closing Date, to such effect.

§6.2     Performance of Agreements. All of the agreements and covenants of Seller to be performed prior to the Closing pursuant to this Agreement shall have been duly performed in all material respects, and Seller shall have delivered to Purchaser a certificate of an executive officer of Seller, dated the Closing Date, to such effect.

§6.3     Use of Premises.  Seller shall assure that Purchaser shall have ten (10) days after Closing to remove the Assets from the Premises.  To the extent that the real property lease for the Premises is not an Assumed Contract or Purchaser does not make arrangements for the use of the Premises with the owner of the Premises, Purchaser shall pay Seller one thousand dollars ($1,000.00) per day for each day Purchaser occupies the Premises for a period not to extend beyond December 31, 2017.

§6.4     No Material Adverse Change.  There shall have been no Material Adverse Change with respect to the Business, and no events, facts or circumstances shall have occurred which could reasonably be expected to result, individually or in the aggregate, in a Material Adverse Change with respect to the Business.

§6.5     Bankruptcy Matters.   The Bankruptcy Court shall have entered the Approval Order, which Approval Order shall not have been stayed, reversed or modified in a manner materially adverse to Purchaser without its consent.

§6.6     Bill of Sale.  Seller shall have executed and delivered to Purchaser a Bill of Sale, substantially in the form of Exhibit C attached hereto (the "Bill of Sale"), confirming its receipt of the Purchase Price and transferring Seller's interest in each of the Purchased Assets to Purchaser.

-21-

§6.7    Assignment and Assumption Agreement.  Seller shall have executed and delivered to Purchaser an Assignment and Assumption Agreement, substantially in the form of Exhibit D attached hereto (the "Assignment and Assumption Agreement"), regarding the assignment of the Purchased Assets by Seller and the assumption of the Assumed Liabilities by Purchaser.

§6.8    Physical Inventory.  After conclusion of the sale approval hearing but at least one (1) day prior to the Closing Date, Purchaser shall have the right, but not the obligation, to conduct an on site physical inventory of the Purchased Assets hereto to confirm that the conditions set forth in Section 6.1 have been satisfied.  Purchaser shall have the right, but not the obligation, to terminate this Agreement pursuant to Section 8.1(b) based on the results of the physical inventory if it demonstrates that the conditions of Section 6.1 have not been met.  If Seller disputes that determination, the Bankruptcy Court will decide.  Seller shall provide site access to Purchaser and shall provide commercially reasonable assistance (including the assistance of Seller's employees) to Purchaser to complete the physical inventory.

ARTICLE VII

CONDITIONS TO SELLER'S OBLIGATIONS

§7. Conditions to Seller's Obligations.  The sale of the Purchased Assets by Seller on the Closing Date is conditioned on the satisfaction or waiver by Seller, at or prior to the Closing, of the following conditions:

§7.1    Truth of Representations and Warranties. The representations and warranties of Purchaser contained in this Agreement or in any Schedule, Exhibit or certificate delivered pursuant to this Agreement shall be true and correct in all material respects when made and as of the Closing, and Purchaser shall have delivered to Seller a certificate of an executive officer of Purchaser, dated the Closing Date, to such effect.

§7.2    Performance of Agreements. All of the agreements and covenants of Purchaser to be performed prior to the Closing pursuant to this Agreement shall have been duly performed in all material respects, and Purchaser shall have delivered to Seller a certificate of and executive officer of Purchaser, dated the Closing Date, to such effect.

§7.3    Bankruptcy Matters.  The Bankruptcy Court shall have entered the Approval Order, which Approval Order shall not have been stayed, reversed or modified in a manner materially adverse to Seller without the consent of Seller.

§7.4    Purchase Price.  Purchaser shall have paid the Purchase Price to Seller.

§7.5    Assignment and Assumption Agreement.  Purchaser shall have executed and delivered to Seller the Assignment and Assumption Agreement.

-22-

9705162.1

ARTICLE VIII

TERMINATION

§8. Termination.

§8.1    Termination. This Agreement may be terminated and the transactions contemplated hereby may be abandoned, at any time prior to the Closing:

(a)    by mutual consent of Seller, on the one hand, and Purchaser, on the other hand;

(b)    by Seller, on the one hand, or Purchaser, on the other hand, if there has been a material breach of any covenant or a material breach of any representation or warranty of Purchaser or Seller, respectively, which breach would cause the failure of any condition precedent set forth in Article VI or VII, as the case may be;

(c)    by the Purchaser or Seller, (i) if the Approval Order has not been entered by the Bankruptcy Court by November 29, 2017 (the "Outside Approval Order Date"), or (ii) if the Bankruptcy Court enters an order (a "Non-Conforming Approval Order") approving the sale of all or any portion of the Purchased Assets to Purchaser, which sale order does not satisfy in any material respect the definition of Approval Order set forth herein, unless the circumstances described in clause (i) or (ii) were due to failure of the party seeking to terminate this Agreement to perform in any material respect its obligations under this Agreement required to be performed by it at or prior to Outside Approval Order Date; provided, however, that any termination right under subsection 8(c)(i) must be exercised on or before the first Business Day after the Outside Approval Order Date, and any termination right under subsection 8(c)(ii) must be exercised on or before the conclusion of the hearing at which the Non-Conforming Approval Order is entered by the Bankruptcy Court;

(d)    by Purchaser, if prior to the Closing the Chapter 11 Case is dismissed, converted to a case under chapter 7 of the Bankruptcy Code or a trustee is appointed in respect of the Chapter 11 Case;

(e)    by Purchaser or Seller, if there shall be any law of any competent authority that makes consummation of the transactions contemplated hereby, illegal or otherwise prohibited or if any Order of any competent authority prohibiting such transactions is entered and such Order shall become final and non-appealable; or

(f)    by Purchaser or Seller due to the failure of the Closing to occur on or before November 30, 2017 by reason of the failure of any condition precedent set forth in Article VI or Article VII, as applicable, which failure is not due to the fault of the party seeking to terminate.

(i)    Effect of Termination. If this Agreement is terminated pursuant to Section 8.1 by Purchaser, on the one hand, or Seller, on the other hand, written notice thereof shall be given to the other party specifying the provision of Section 8.1 pursuant to which such

-23-

9705162.1

termination is made, and this Agreement shall be terminated and there shall be no Liability hereunder on the part of the Purchaser or Seller, except that the provisions of Section 5.1(b) (Review of the Business), Section 5.2 (Public Announcements), Section 5.5(c) (Expense Reimbursement), Section 8.1 (Termination), this Section 8.2, Section 9.1 (Expenses), Section 9.2 (Governing Law), Section 9.3 (Jurisdiction), Section 9.5 (Notices), Section 9.11 (Third Party Beneficiaries) and Section 9.13 (Waiver of Jury Trial) shall survive any termination of this Agreement. Nothing in this Section 8.2 shall relieve any party hereto of Liability for any willful breach of this Agreement.

(ii)    Remedies.    In the event that this Agreement is breached by Seller, Purchaser's remedies shall include but not be limited to return of the Deposit, money damages or the right to request specific performance of this Agreement. In the event that this Agreement is breached by Purchaser, Seller's remedies shall include, but not limited to retention of the Deposit, money damages, and the right to request specific performance of this Agreement.

## ARTICLE IX

## MISCELLANEOUS

§9.  Miscellaneous.

§9.1    Time of Essence. Time is of the essence of this Agreement and all of the terms, provisions, covenants and conditions hereof.

§9.2    Expenses. Except for the payment of the Expense Reimbursement, the parties hereto shall pay all of their own expenses relating to the transactions contemplated by this Agreement, including the fees and expenses of their respective counsel and financial advisers.

§9.3    Governing Law. Except to the extent the Bankruptcy Code is applicable, the interpretation and construction of this Agreement, and all matters relating hereto, shall be governed by the laws of the State of Ohio applicable to agreements executed and to be performed solely within such State.

§9.4    Jurisdiction; Agents for Service of Process. Any judicial proceeding brought against any of the parties to this Agreement on any dispute arising out of this Agreement or any matter related hereto may be brought in the Bankruptcy Court, and, by execution and delivery of this Agreement, each of the parties to this Agreement accepts the exclusive jurisdiction of the Bankruptcy Court, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement. Each of Seller and Purchaser agrees that service of any process, summons, notice or document by U.S. registered mail to such party's address set forth below shall be effective service of process for any action, suit or proceeding in Ohio with respect to any matters for which it has submitted to jurisdiction pursuant to this Section 9.3.

§9.5    Table of Contents; Captions. The table of contents and the Article and Section captions used herein are for reference purposes only, and shall not in any way affect the meaning or interpretation of this Agreement.

9705162.1

§9.6    Notices. Any notice or other communication required or permitted under this Agreement shall be deemed to have been duly given (i) five (5) Business Days following deposit in the mail if sent by registered or certified mail, postage prepaid, (ii) when sent, if sent by email transmission, if receipt thereof is confirmed by telephone, (iii) when delivered, if delivered personally to the intended recipient and (iv) two Business Days following deposit with a nationally recognized overnight courier service, in each case addressed as follows:

if to Seller, to


Data Cooling Technologies, LLC
1717 Miller Parkway
Streetsboro, Ohio 44241
Telephone:  (216) 832-6977
Email: rszekelyi@phoenixmanagement.com
Attn: Richard Szekelyi, CRO

with a copy to

McDonald Hopkins LLC
600 Superior Ave. E, Suite 2100
Cleveland, OH  44114
**Telephone: (216)348-5436**
**Email: smalloy@mcdonaldhopkins.com**
**Attn: Sean Malloy**

and if to the Purchaser, to

KyotoCooling North America LLC
14160 Dallas Parkway, Suite 410
Dallas, Texas 75254
Telephone:  (214) _____
Email:
Attn:  Mr John Drossos

with a copy to

Hahn Loeser & Parks LLP
200 Public Square, Suite 2800
Cleveland, OH  44114-2316
Telephone: (216) 274-2432
Email: dad@hahnlaw.com
Attn: Daniel A. DeMarco


or such other address or number as shall be furnished in writing by any such party.

9705162.1

§9.7   Assignment; Parties in Interest. This Agreement may not be transferred, assigned, pledged or hypothecated by any party hereto without the express written consent of the other party, other than by operation of law; provided, that so long as Purchaser remains jointly and several liable for its obligations and liabilities hereunder and the Ancillary Agreements, (i) Purchaser may assign its rights, interests and obligations hereunder to any direct or indirect wholly owned Subsidiary or to any Affiliate of which Purchaser is a direct or indirect wholly owned Subsidiary, and (ii) Purchaser may grant its lenders a security interest in its rights under this Agreement. This Agreement shall be binding upon and shall inure to the benefit of each of the parties hereto and its respective heirs, executors, administrators, successors and permitted assigns.

§9.8   Counterparts. This Agreement may be executed in two (2) or more counterparts, all of which taken together shall constitute one (1) instrument. Any executed counterpart of this Agreement delivered by facsimile or other electronic transmission to a party hereto shall constitute and be deemed an original counterpart of this Agreement.

§9.9   Entire Agreement. This Agreement, including the other documents referred to herein which form a part hereof, and the Ancillary Agreements contain the entire understanding of the parties hereto with respect to the subject matter contained herein and therein. This Agreement and the Ancillary Agreements supersede all prior agreements and understandings between the parties with respect to such subject matter.

§9.10   Amendments. This Agreement, including the instant section, may not be changed, and any of the terms, covenants, representations, warranties and conditions cannot be waived, except pursuant to an instrument in writing signed by Purchaser and Seller or, in the case of a waiver, by the party waiving compliance.

§9.11   Severability. If any term, provision, agreement, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, agreements, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party hereto. Upon such a determination, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible.

§9.12   Third Party Beneficiaries. Each party hereto intends that this Agreement shall not benefit or create any right or cause of action in or on behalf of any Person other than the parties hereto.

§9.13   No Strict Construction. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event any ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by all parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any provision of this Agreement.

-26-

9705162.1

§9.14  Waiver of Jury Trial.  Each of Purchaser and Seller hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any litigation as between the parties directly or indirectly arising out of, under or in connection with this Agreement or the transactions contemplated hereby or disputes relating hereto. Purchaser and Seller (i) certify that no representative, agent or attorney of the other party has represented, expressly or otherwise that such other party would not, in the event of litigation, seek to enforce the foregoing waiver, and (ii) acknowledge that it and the other party have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 9.13.

§9.15  Survival of Representations and Warranties.  The representations and warranties of Seller contained in this Agreement or in any agreement, document or instrument delivered pursuant to or in connection with this Agreement shall not survive the Closing

**"AS-IS/WHERE IS".  EXCEPT AS NOTED ABOVE AND AS OTHERWISE EXPRESSLY NOTED IN THIS AGREEMENT, THE PURCHASE AND SALE OF THE PURCHASED ASSETS IS "AS-IS" AND "WHERE-IS" WITH ALL FAULTS IN ALL RESPECTS.  EXCEPT AS EXPRESSLY SET FORTH HEREIN, SELLER DISCLAIMS ANY AND ALL OTHER WARRANTIES WITH RESPECT TO THE PURCHASED ASSETS, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THOSE OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.**

9705162.1

IN WITNESS WHEREOF, each of Purchaser and Seller has caused its corporate name to be hereunto subscribed by its officer thereunto duly authorized, all as of the day and year first above written.

KYOTOCOOLING NORTH AMERICA, LLC

By: _____

Name: John Drossos
Title: Chief Executive Officer


DATA COOLING TECHNOLOGIES, LLC

By: _____

Name: Richard Szekelyi Title: Chief Restructuring Officer

-28-

9705162.1